*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 5**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JENAFER BIRT MEEKS, individually and on behalf of the heirs and estate of LILLIAN BIRT, deceased,
*Appellee,*

*v.*

WEI PENG, M.D., PhD and CHRISTINA G. RICHARDS, M.D., F.A.C.S.,
*Appellants.*

No. 20220815
Heard September 6, 2023
Filed February 15, 2024

On Direct Appeal

Third District, Salt Lake County
The Honorable Matthew Bates
No. 180902456

Attorneys:

Karra J. Porter, Anna P. Christiansen, Salt Lake City, for appellee

Troy L. Booher, Caroline A. Olsen, Taylor P. Webb, Salt Lake City, for appellants

JUSTICE HAGEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, and JUSTICE POHLMAN joined.

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1   This medical malpractice case stems from the withdrawal of life-sustaining treatment that resulted in the death of Lillian Birt. While Ms. Birt was in the intensive care unit (ICU), her children decided to discontinue life support based on their understanding of conversations they had with their mother's treating doctors about her condition. The children believed that their mother's

condition was terminal and that the treatment was unnaturally prolonging her life. But, in fact, their mother's condition was not terminal; there was a high likelihood that she would have recovered if treatment had been continued.

¶2     After Ms. Birt died, her daughter, Jenafer Meeks, sued the doctors for medical malpractice—individually, and on behalf of Ms. Birt's heirs and estate—alleging, in part, that the doctors did not properly inform Ms. Birt's children of their mother's condition before allowing them to request that her care be withdrawn. Ms. Meeks sought damages for two different types of harm—harm done to the heirs as a result of the death through a wrongful death action and harm done to Ms. Birt before her death through a survival action.

¶3     At trial, the district court informed the jury of the elements of medical malpractice in instruction 23. That instruction, which was based on the Model Utah Civil Jury Instructions, told the jury, "Plaintiffs have the burden of proving two things: (1) a breach of the standard of care and (2) that the breach was a cause of Plaintiffs' injuries." The doctors objected to instruction 23, arguing that it failed to inform the jury that the plaintiff had the burden to prove what standard of care applied in this situation. The district court disagreed. It reasoned that by stating the plaintiff had to prove "a breach of the standard of care," the instruction implied that the jury must first determine the standard of care.

¶4     The jury ultimately found that the doctors acted negligently in connection with the withdrawal of care and awarded damages to the heirs on the wrongful death claim and to the estate on the survival claim. The doctors moved for judgment as a matter of law on the estate's survival claim, which was meant to compensate the estate for the harm done to Ms. Birt before her death due to the doctors' negligence. The doctors argued, in part, that Ms. Meeks did not provide any evidence allowing a jury to reasonably infer that Ms. Birt had experienced pain and suffering in the hours before her death. The district court denied the motion, finding that the jury could use evidence of Ms. Birt's experience before doctors withdrew life-sustaining care to infer that she experienced pain and suffering after that care was withdrawn.

¶5     The doctors raise two issues on appeal. First, they argue that they are entitled to a new trial because instruction 23 did not explicitly tell the jury that Ms. Meeks had the burden to prove the standard of care. Second, the doctors argue that the district court

erred when it declined to grant them judgment as a matter of law on the survival claim because Ms. Meeks did not provide any evidence that Ms. Birt experienced pain, suffering, or inconvenience in the hours between the doctors' negligence and her death.

¶6    We hold that the district court correctly instructed the jury that Ms. Meeks had the burden of proving the standard of care to establish medical malpractice. But we hold that the court erred in denying the doctors' motion for judgment as a matter of law on the survival claim. Ms. Meeks failed to provide evidence—medical or otherwise—that Ms. Birt experienced pain, suffering, or inconvenience during the period between the doctors' negligence and her death.

¶7    We affirm in part and reverse in part.

## BACKGROUND[1]

### A. Ms. Birt's Hospitalization

¶8    After experiencing complications from a surgery performed by Dr. Christina Richards, Lillian Birt was diagnosed with pneumonia and sepsis and was placed on life support. She was later admitted to the ICU, where she was treated primarily by Dr. Wei Peng.

¶9    Over the next several days, Ms. Birt remained on life support because she was still suffering from respiratory failure, septic shock, and decreased heart function.

¶10 A few days before Ms. Birt's death, the hospital staff conducted "weaning trials" to determine whether Ms. Birt could be taken off the ventilator. During these weaning trials, the doctors took Ms. Birt off sedatives and pain medication, woke her up, and removed the ventilator to see if she could breathe on her own. Ms. Meeks testified that during the weaning trials, the medical staff "had to take her [mother] off what was keeping her asleep or not in pain." She described her mother's experience this way: "She would try to breathe. I don't know if you've ever seen someone try to breathe and they can't. They're writhing. I felt like she was in a lot of pain, moaning and groaning."

---

[1] "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict." *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 3, 82 P.3d 1076 (cleaned up).

¶11 Despite the negative prognosis and the failed weaning trials, Ms. Birt was not terminal. Dr. Peng testified that she "had a very good chance to return to another care facility if we [had kept] going." He estimated she had up to a twenty percent chance of mortality. In other words, there was likely over an eighty percent chance that she would have survived if care had been continued.

¶12 After discussing their mother's condition with Dr. Peng, Ms. Birt's children understood that their mother would never come off the ventilator. Ms. Meeks understood that Dr. Peng was proposing two options: Ms. Birt could either undergo a tracheostomy and spend the remainder of her life in a nursing home or be taken off life support. Ms. Meeks "felt like [her mother] was already gone. Like there wasn't anything." Dr. Peng did not tell Ms. Meeks that her mother was improving or that she was likely to recover. Likewise, Ms. Meeks's brother understood that his mother would be kept on a ventilator for ten to fourteen days and then transferred to a long-term care facility where she would spend her last days. No one told the children that their mother could have a meaningful recovery and could potentially go home. And even though both Dr. Richards and Dr. Peng knew that Ms. Birt had a good chance of surviving, because they wanted to respect the family's wishes, they did not attempt to dissuade the children from withdrawing care.

¶13 Reluctantly, the children agreed to withdraw Ms. Birt's life support. After his conversation with the children, Dr. Peng gave Ms. Meeks a form to sign indicating that Ms. Birt's condition was "terminal" and that "[t]o continue providing life-saving procedures would only serve to unnaturally prolong the moment of death and unnaturally postpone or prolong the dying process." Dr. Richards, as the treating surgeon, also signed this consent form asserting that continuing Ms. Birt's treatment would unnaturally prolong the dying process. Unbeknownst to the children, the statements on the form were untrue.

¶14 Ms. Birt was taken off the ventilator but remained on palliative care, including sedation and pain management. According to Ms. Meeks, her mother made no effort to breathe after care was withdrawn. She died eight hours after Ms. Meeks signed the form to withdraw life-sustaining care.

*B. The Trial*

¶15 Ms. Meeks brought a lawsuit against the doctors on behalf of her mother's heirs and estate. The complaint alleged two causes

4

of action seeking different types of damages that resulted from alleged medical malpractice. The first, a wrongful death claim, sought to recover damages incurred by the heirs as a result of Ms. Birt's death. The second, a survival claim, sought to recover damages for the estate based on the harm suffered by Ms. Birt before her death.[2]

¶16 Ms. Meeks's theory at trial was that Dr. Peng and Dr. Richards failed to properly inform the children that their mother had a high likelihood of recovery and that the doctors failed to dissuade the children from withdrawing care. The parties agreed that the doctors had the duty to gain the family's informed consent before withdrawing care. However, the parties disagreed about whether the standard of care required the doctors to take additional steps to actively dissuade the family from choosing to withdraw care because Ms. Birt had a high chance of surviving and making a meaningful recovery. For example, Ms. Meeks argued that the doctors had a duty to bring in others to communicate with the family, to take the matter "to the ethics committee," or to "say[] no and go[] to court."

¶17 In the end, the jury returned a verdict for Ms. Meeks on both the wrongful death and survival claims. The jury awarded Ms. Birt's children $4 million for the wrongful death of their mother and awarded the estate $1 million in noneconomic damages for Ms. Birt's pain and suffering before her death. After a motion from the doctors, the district court reduced the noneconomic damages to $450,000 in accordance with Utah Code section 78B-3-410(1)(d).

¶18 On appeal, the doctors contend that two errors occurred at trial: (1) the district court incorrectly instructed the jury on the elements of medical malpractice, and (2) the doctors were entitled to judgment as a matter of law on the survival action.

1. Jury Instructions

¶19 To instruct the jury on the elements of medical malpractice, Ms. Meeks proposed an instruction based on Model

---

[2] The complaint labeled the first cause of action as "Medical Malpractice" and the second cause of action as "Survival Action - UTAH CODE § 78B-3-107." But both causes of action alleged medical malpractice; the causes of action differed in the type of damages sought. *See infra* ¶¶ 48–55.

Utah Civil Jury Instruction CV301B. The proposed instruction read as follows:

> To establish that Defendants were at fault, Plaintiffs have the burden of proving two things: (1) breach of the standard of care and (2) that the breach was a cause of Plaintiffs' injuries.

The doctors opposed this instruction, arguing that it did not properly inform the jury that the plaintiff had the burden to prove the standard of care.

¶20 The district court denied the doctors' request for a replacement instruction. In relevant part, the court reasoned that "by stating that the plaintiff has the burden of proving a breach of the standard of care, it's implicit that [the plaintiff] must, in fact, prove what the standard of care is." Accordingly, the court gave Ms. Meeks's proposed instruction as instruction 23.

¶21 Following the jury's verdict, the doctors moved for a new trial, renewing their argument that instruction 23 misstated the law. Specifically, the doctors argued that because "standard of care" was not listed as an independent element of medical malpractice, the jury might not have understood that the plaintiff had the burden to prove the standard of care.

¶22 The district court denied the doctors' motion, concluding that the jury instructions, read as a whole, implicitly informed the jury that Ms. Meeks had the burden to prove the standard of care. The court pointed to stipulated jury instructions 9 and 24 as aiding the jury in understanding its duty regarding standard of care. Instruction 9 defined the preponderance of the evidence standard and instructed the jury that the party with the burden of proof must "persuade you, by the evidence, that the fact is more likely to be true than not true." Instruction 24 informed the jury that it had "to decide, based on the evidence, what the standard of care is." Instruction 24 also stated that it was the jury's "responsibility to determine the credibility of the experts and to resolve the dispute." The court reasoned instructions 9, 23, and 24, read together, accurately informed the jury that the standard of care was a factual determination left for it to resolve. Additionally, the court concluded that even if instruction 23 was incorrect, it was harmless because both sides had put forth evidence of the standard of care and the jury simply had to decide which of the two competing standards was more convincing. Therefore, the court denied the motion for a new trial.

2. Survival Action Damages

¶23 At the close of Ms. Meeks's case-in-chief, the doctors moved for a directed verdict with respect to the estate's survival claim. They argued that Ms. Meeks had provided insufficient evidence that Ms. Birt experienced pain and suffering after the withdrawal of care but before her death.

¶24 The court denied the doctors' motion. It reasoned that the jury could rely on evidence regarding the weaning trials to conclude Ms. Birt "suffered during the period between which care was withdrawn and she, in fact, passed." The court ruled that "this is not one of those cases where it takes medical expertise for the jury to draw that connection" between the weaning trials and when care was withdrawn. Because the jury heard testimony that the family had watched Ms. Birt "struggling to breathe and that they saw her experiencing pain" during the weaning trials, the court concluded that there was evidence that could support a verdict awarding general damages to the estate.

¶25 After the jury verdict, the doctors renewed their motion for judgment as a matter of law on the survival claim, again arguing that Ms. Meeks did not provide sufficient evidence that Ms. Birt experienced pain and suffering between the withdrawal of care and her death. Additionally, the doctors argued that Ms. Birt was incapable of experiencing pain and suffering because she was unconscious and on palliative care.

¶26 The district court denied the motion. The court stated that because Ms. Meeks presented evidence that Ms. Birt was in pain during the weaning trials, the jury could reasonably infer that Ms. Birt experienced pain when she was taken off the ventilator for the last time. Further, the court concluded that Utah law did not require an injured person to be conscious to recover noneconomic damages. Accordingly, the court upheld the jury's verdict and entered judgment, awarding the estate the statutory limit of $450,000 in general damages.

**ISSUES AND STANDARDS OF REVIEW**

¶27 On appeal, the doctors raise two issues. First, they argue that the district court did not correctly instruct the jury that the plaintiff had the burden of proving the standard of care to establish medical malpractice. "Claims of erroneous jury instructions present questions of law that we review for correctness. We therefore review the instructions given to the jury without

deference to the trial court . . . ." *Turner v. Univ. of Utah Hosps. & Clinics*, 2013 UT 52, ¶ 17, 310 P.3d 1212 (cleaned up).

¶28 Second, the doctors argue that the district court erred when it denied their motions for judgment as a matter of law on the survival claim. Specifically, they argue that Ms. Meeks did not prove that Ms. Birt experienced (or was capable of experiencing) pain and suffering between the time treatment was withdrawn and her death. We review a district court's denial of judgment as a matter of law for correctness. *UMIA Ins., Inc. v. Saltz*, 2022 UT 21, ¶ 26, 515 P.3d 406. To prevail, the appellant must "demonstrate that there was no basis in the evidence, including reasonable inferences which could be drawn therefrom, to support the jury's verdict." *Id.* (cleaned up).

## ANALYSIS

¶29 This case involves two causes of action, both alleging that the doctors committed medical malpractice in connection with the withdrawal of life-sustaining care, which led to Ms. Birt's death. The first is a wrongful death claim brought on behalf of Ms. Birt's heirs for damages they suffered. The second is a survival claim brought on behalf of the estate for the damages that Ms. Birt incurred before her death.

¶30 On appeal, the doctors seek a new trial on both claims because, they argue, the jury instructions incorrectly stated the elements of medical malpractice. Specifically, the doctors argue that jury instruction 23 did not properly inform the jury that Ms. Meeks had the burden to prove the standard of care. In addition, the doctors contend that they were entitled to judgment as a matter of law on the survival claim. They argue that Ms. Meeks produced no evidence to prove that her mother experienced pain and suffering after life-sustaining treatment was withdrawn but before she died.

¶31 We first analyze whether instruction 23 correctly informed the jury that Ms. Meeks bore the burden to prove each element of medical malpractice. We conclude that by instructing the jury that the plaintiff had the burden to prove "a breach of the standard of care," the instruction implicitly required the jury to find that Ms. Meeks proved both standard of care and breach. Next, we analyze whether the district court erred in denying the doctors' renewed motion for judgment as a matter of law. Because we conclude that Ms. Meeks presented insufficient evidence to prove that the doctors' negligence caused Ms. Birt to experience a diminished

quality of life between the withdrawal of care and the time of her death, the doctors are entitled to judgment as a matter of law on the survival claim.

### I. THE DISTRICT COURT DID NOT ERR IN INSTRUCTING THE JURY ABOUT THE PLAINTIFF'S BURDEN OF PROOF

¶32 The doctors seek a new trial on both the wrongful death and survival claims, arguing that the district court did not properly instruct the jury on the elements of medical malpractice. Specifically, the doctors contend that instruction 23 failed to instruct the jury that Ms. Meeks bore the burden to prove the standard of care. Ms. Meeks does not dispute that she had the burden to prove the standard of care, but she argues that instruction 23 adequately advised the jury of the correct legal standard. According to Ms. Meeks, an instruction that the plaintiff had the burden to prove "a breach of the standard of care" necessarily meant Ms. Meeks could succeed only if she convinced the jury of two things: (1) the standard of care, and (2) that the standard of care was breached.

¶33 "We review challenges to jury instructions under a correctness standard." *Child v. Gonda*, 972 P.2d 425, 429 (Utah 1998) (cleaned up). "When reviewing jury instructions, we must consider the challenged instruction in context." *Gorostieta v. Parkinson*, 2000 UT 99, ¶ 46, 17 P.3d 1110. And we "will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case."[3] *Jensen v. IHC Health Servs., Inc.*, 2020 UT 57, ¶ 27, 472 P.3d 935 (cleaned up).

¶34 To establish a claim of medical malpractice, a plaintiff has the burden to prove four elements: "(1) the standard of care by which the physician's conduct is to be measured, (2) breach of that standard by the physician, (3) injury that was proximately caused by the physician's negligence, and (4) damages." *Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 96, 82 P.3d 1076 (cleaned up). Instead of laying out all four elements of medical malpractice, the district court followed Model Utah Civil Jury Instruction CV301B, which

---

[3] Like the district court, Ms. Meeks also points to instructions 9 (defining preponderance of the evidence) and 24 (defining the standard of care) and argues that when instructions 9, 23, and 24 are read together, they accurately state the law. Because we conclude that instruction 23—read on its own—accurately reflects the law, we have no need to consider instructions 9 and 24.

collapses the first two elements into a single element and addresses damages in a separate instruction. Following that model, instruction 23 stated the elements of medical malpractice as follows: "To establish that Defendants were at fault, Plaintiffs have the burden of proving two things: (1) a breach of the standard of care and (2) that the breach was a cause of Plaintiffs' injuries."

¶35 "Jury instructions require no particular form so long as they accurately convey the law." *State v. Maama*, 2015 UT App 234, ¶ 16, 359 P.3d 1266. We have never required jury instructions to mirror the exact language on which they are based. For example, "the rewording of a statute as a jury instruction is not error as long as it does not change the essential meaning of the statute." *Gorostieta*, 2000 UT 99, ¶ 46. So long as they correctly state the law, "the precise wording and specificity of jury instructions is left to the sound discretion of the trial court." *State v. Salgado*, 2018 UT App 139, ¶ 24, 427 P.3d 1228 (cleaned up).

¶36 Here, the district court modeled instruction 23 on Model Utah Jury Civil Instruction CV301B. Although the Model Utah Jury Instructions (MUJI) provide guidance to attorneys and district courts about how to instruct a jury, those instructions "are merely advisory and do not necessarily represent correct statements of Utah law." *Jones v. Cyprus Plateau Mining Corp.*, 944 P.2d 357, 359 (Utah 1997).

¶37 But we note that MUJI is not alone in recommending jury instructions that collapse the first two elements of medical malpractice. For example, one treatise recognizes that the plaintiff bears the burden of proving standard of care, breach of the standard of care, and causation, *see* 61 Am. Jur. 2d *Physicians, Surgeons, and Other Healers* § 309 (2023), but recommends jury instructions that combine the first two elements—"[t]hat the defendant, in treating and caring for the plaintiff, failed to use reasonable care or skill," 19B Am. Jur. Pleading & Practice Forms *Physicians, Surgeons, and Other Healers* § 372 (2023). Arizona similarly requires a plaintiff in a medical malpractice claim to prove "the existence of a duty, a breach of that duty, causation, and damages." *Seisinger v. Siebel*, 203 P.3d 483, 492 (Ariz. 2009) (en banc). However, the Arizona Pattern Jury Instructions also collapse the first two elements, requiring the jury to find "medical negligence" and defining that term as "the failure to comply with the applicable standard of care." Revised Ariz. Jury Instructions (Civ.), *Medical Negligence* 1 (7th ed. 2020). While not dispositive,

these examples illustrate that it is not uncommon for jury instructions to combine what one might think of as separate elements of a claim.

¶38 In the criminal context, our court of appeals has recognized that jury instructions do not need to separately list each subsidiary factual determination as a separate element to correctly state the law. In *State v. Beckering*, 2015 UT App 53, 346 P.3d 672, Beckering was charged with being a party to the intentional or knowing aggravated abuse of a vulnerable adult. *Id.* ¶ 17. Beckering argued that his attorney was ineffective for not requesting jury instructions that listed "each discrete factual inquiry as a separate element of [the] offense." *Id.* ¶ 25. For example, "the element asking the jury to determine whether he 'cause[d] a vulnerable adult to suffer serious physical injury' required the jury to make at least three subsidiary factual determinations: (1) that Beckering caused an injury, (2) that the injury was a serious physical injury, and (3) that the injured person was a vulnerable adult." *Id.* ¶ 24 (alteration in original). Beckering argued that his counsel should have requested an instruction that listed each of those subsidiary questions as "a separate factual determination that the State needed to prove and the jury needed to decide." *Id.* ¶ 22.

¶39 The court of appeals concluded that there was "no deficient performance by counsel in allowing the elements instructions to present multiple factual determinations within individual elements, because the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *Id.* ¶ 27 (cleaned up). The authority Beckering cited did not suggest "that elements must be presented to a jury in any particular form," only that each element must be proved to the jury beyond a reasonable doubt. *Id.* ¶ 26. That requirement was satisfied because "[w]hen a single element in a criminal-elements instruction contains multiple factual determinations, the element implicitly requires the jury to resolve each of those factual determinations." *Id.* ¶ 24.

¶40 We agree with the reasoning in *Beckering*. So long as the instruction requires the jury to find that the party with the burden of proof has established each element, the elements do not need to be presented in any particular form. An instruction may combine more than one discrete factual inquiry into a single element if it implicitly requires the jury to resolve each question in accordance with the appropriate burden of proof.

¶41   Here, instruction 23 informed the jury that the plaintiff had the burden to prove "a breach of the standard of care." That instruction implicitly required the jury to determine whether Ms. Meeks had established two subsidiary elements: (1) the applicable standard of care, and (2) that the doctors breached that standard of care. It is immaterial that those two sub-elements were not separately numbered as discrete inquiries. A jury could not determine whether Ms. Meeks had proved there was a breach of the standard of care without first determining that she had proved what standard of care applied.

¶42   As the facts of this case illustrate, a jury's finding that the plaintiff has proven a breach of the standard of care necessarily encompasses a finding that the plaintiff has proven both the applicable standard of care and that a breach occurred. At trial, Ms. Meeks pointed to various acts or omissions to support her claim that the doctors were negligent. Those acts or omissions fell within one of two broad categories: that the doctors failed to fully inform the family of Ms. Birt's condition when obtaining their consent to withdraw care, or that, afterwards, the doctors failed to take steps to dissuade the family or override their decision. To find that the doctors breached the standard of care by not fully informing the family of Ms. Birt's condition, the jury necessarily had to determine, first, that the standard of care required the doctors to convey certain information under the circumstances and, second, that the doctors failed to provide that information. Similarly, to find that the doctors breached the standard of care by not taking further steps to dissuade the family or override their wishes, the jury would first have to find that the standard of care applicable to Ms. Birt's situation required the doctors to take a particular step and would then have to find that the doctors failed to do so. In other words, the jury could not conclude that Ms. Meeks proved a breach of the standard of care without finding that she proved both subsidiary elements.

¶43   By instructing the jury that it was the plaintiff's burden to prove a breach of the standard of care, instruction 23 implicitly required the jury to determine that Ms. Meeks proved both the applicable standard of care and that the doctors breached that standard.[4] Because the instruction conveyed that it was the

--------

[4] Although we have determined that instruction 23 correctly states the law, our holding does not prevent a party from

(continued . . .)

plaintiff's burden to prove the standard of care, it was a correct statement of the law.[5] Therefore, the district court properly denied the doctors' motion for a new trial.

## II. THE DISTRICT COURT ERRED IN GRANTING THE ESTATE GENERAL DAMAGES ON THE SURVIVAL ACTION

¶44   In their second issue on appeal, the doctors argue that the district court erred in denying their motions for judgment as a matter of law on the survival claim. We will overturn the district court's decision "only if the appellant can demonstrate that there was no basis in the evidence, including reasonable inferences which could be drawn therefrom, to support the jury's verdict." *UMIA Ins., Inc. v. Saltz*, 2022 UT 21, ¶ 26, 515 P.3d 406 (cleaned up).

¶45   The doctors argue that there was no basis in the evidence from which a reasonable jury could conclude that Ms. Birt experienced pain, suffering, or inconvenience between the time life-sustaining care was withdrawn and the time of her death. Additionally, they argue that Ms. Meeks was required—but failed—to prove that Ms. Birt was consciously aware of any pain or suffering she endured during that time.

¶46   In response, Ms. Meeks points to evidence that her mother had "shown visible [signs of] distress" during prior attempts to wean her from the ventilator. Ms. Meeks contends that the jury could draw a reasonable inference that when life-sustaining care

---

requesting an alternative instruction that lists each element separately or that explicitly states the plaintiff's burden to prove each element by a preponderance of the evidence.

[5] The doctors' complaint that the instructions did not adequately explain the plaintiff's burden of proof might have been better directed at jury instruction 24, which reflected the definition of standard of care found in MUJI CV301C. Without referencing the burden of proof, instruction 24 told the jury that the parties' "expert witnesses may disagree as to what the standard of care is and what it requires" and that it was the jury's "responsibility to determine the credibility of the experts and to resolve the dispute." But both sides stipulated to that instruction. Because the doctors did not challenge jury instruction 24, its correctness is not before us. Nonetheless, we recommend that the Committee on the Civil MUJI consider whether MUJI CV301C should be modified to clearly set forth the burden of proof.

was withdrawn, her mother's "body suffered the same traumatic effects that caused her to moan and writhe each time before." But, in Ms. Meeks's view, general damages are not limited to the pain, suffering, and inconvenience suffered by Ms. Birt between the time of the negligence and the time of her death. Ms. Meeks argues that the estate is "entitled to compensation for the difference between what life would have been like for [Ms. Birt] without the negligence, and what it was like because of the negligence." Ms. Meeks posits that, without the negligence, Ms. Birt "would have recovered, gone home, spent time with her children, played with her grandchildren—had a 'good life.'" But because of the negligence, "[s]he had no abilities, no joys, no opportunities, no life expectancy."

¶47 We conclude that the district court erred in denying the motions for judgment as a matter of law because there was no evidence to support an award of damages to the estate on the survival claim. We first clarify that the estate was entitled to recover damages only for Ms. Birt's pain, suffering, and inconvenience suffered between the time of the negligence and the time of her death. We then examine the evidence of what occurred during those eight hours and conclude that it does not support a reasonable inference that Ms. Birt experienced pain, suffering, or inconvenience during the relevant time frame.

### A. The Estate Can Recover Only for Harms Suffered During Ms. Birt's Life

¶48 This medical malpractice case involves two claims: a wrongful death claim brought on behalf of Ms. Birt's heirs and a survival claim brought on behalf of her estate. Survival claims and wrongful death claims are separate causes of action meant to redress different types of harm.

¶49 At common law, a cause of action for tort abated when the tort victim died. *See Meads v. Dibblee*, 350 P.2d 853, 855 (Utah 1960). In other words, once a tort victim died, the victim's heirs or estate could not recover damages for the tort. *See id.*; *see also* Dan B. Dobbs, *Wrongful Death and Survival Actions*, in THE LAW OF TORTS § 372 (2d ed. 2023). To remedy this inherent injustice, lawmakers in various jurisdictions enacted laws that allow for two different causes of action when a tort victim dies as a result of the tort: wrongful death actions and survival actions. *See, e.g., Kynaston v. United States*, 717 F.2d 506, 511 (10th Cir. 1983).

¶50 Wrongful death statutes create a new cause of action for the survivors of the deceased, such as parents or heirs. *See Meads*, 350 P.2d at 855 & n.2. Wrongful death claims acknowledge that the survivors "suffer a direct loss to themselves" when their loved one dies from a wrongful act. *Id.* Accordingly, the damages recovered in wrongful death actions are meant to compensate the harm done to the survivors because of the death. *Id.* Damages in a wrongful death suit include "[loss of] financial support furnished; loss of affection, counsel, and advice; loss of deceased's care and solicitude for the welfare of the family; and loss of the comfort and pleasure the family of [the] deceased would have received." *Est. of Faucheaux v. City of Provo*, 2019 UT 41, ¶ 11, 449 P.3d 112 (cleaned up); *see also Meads*, 350 P.2d at 855 ("If the deceased is an adult, the spouse, or children if any, are entitled to support, society, counsel and advice and many other incidental benefits which they would have received if [the deceased] had lived . . . .").

¶51 While wrongful death statutes create a new cause of action to compensate for the death itself, "[s]urvival statutes provide for the continuance of an injured person's cause of action in order to preserve any interests which have accrued in the recovery of damages to his estate should he die prior to the resolution of the suit." *Est. of Berkemeir ex rel. Nielsen v. Hartford Ins. Co. of the Midwest*, 2003 UT App 78, ¶ 13, 67 P.3d 1012 (cleaned up) *aff'd*, 2004 UT 104, 106 P.3d 700; *accord Berrett v. Albertsons Inc.*, 2012 UT App 371, ¶ 45, 293 P.3d 1108. Put more simply, "[t]he injured party's claim after his death becomes a part of the estate, and the damages recoverable are only those the injured person might have recovered had he lived." *Kynaston*, 717 F.2d at 511. In a survival action, the estate stands in the place of the decedent to recover the damage done to the decedent. *Id.* at 510. An award of damages "under a survival statute has no effect upon the damages given under a [wrongful] death statute, since the damages in the one case are based upon events preceding death, while the damages under the other statute are based upon harm caused by the death." RESTATEMENT (SECOND) OF TORTS § 925 cmt. I (AM. L. INST. 1979).

¶52 Like other jurisdictions, the Utah Legislature enacted statutes that allow for both wrongful death claims, *see* UTAH CODE § 78B-3-106, and survival claims, *see id.* § 78B-3-107. Utah first enacted a wrongful death statute through the territorial legislature in 1888. *Meads*, 350 P.2d at 854 n.2. The current law states that "when the death of a person is caused by the wrongful act or neglect of another, his heirs, or his personal representatives for the

15

benefit of his heirs, may maintain an action for damages against the person causing the death." Utah Code § 78B-3-106(1). Damages in a wrongful death action "may be given as under all the circumstances of the case may be just," *id.* § 78B-3-106(4), for the benefit of the deceased's heirs, *see id.* § 78B-3-105; *see also Faucheaux*, 2019 UT 41, ¶¶ 10–11.

¶53  In contrast, the survival statute, in relevant part, prevents an injured individual's existing cause of action from abating upon their death. Utah Code § 78B-3-107. When Utah enacted its first survival statute, "[t]he purpose of the statute was not to create a new cause of action as the wrongful death statute did, but rather to abrogate the common law rule of abatement and continue or perpetuate ('survive') a cause of action in existence before the wrongdoer's [or victim's] death." *Berkemeir*, 2003 UT App 78, ¶ 13 (second alteration in original) (quoting *Kynaston*, 717 F.2d at 509).

¶54  In a survival action, "the personal representatives or heirs of the individual who died[] ha[ve] a cause of action against the wrongdoer . . . for special and general damages." Utah Code § 78B-3-107(1)(a). Special damages, which are sometimes referred to as "specific" or "economic" damages, "measure harm that is considered more finite, measurable, and economic because it is more easily calculated in specific dollar amounts," like medical or other necessary care expenses. *Sheppard v. Geneva Rock*, 2021 UT 31, ¶ 17 n.5, 493 P.3d 632 (cleaned up). On the other hand, "[g]eneral damages, which are sometimes referred to as 'pain and suffering' or 'noneconomic' damages, measure the amount needed to compensate an individual for a 'diminished capacity for the enjoyment of life.'" *Id.* (cleaned up).

¶55  In this case, Ms. Meeks brought a wrongful death claim on behalf of the heirs, seeking noneconomic damages to compensate them for the loss they suffered due to their mother's death. Ms. Meeks also asserted a cause of action for medical malpractice on behalf of the estate because, by virtue of the survival statute, that claim did not abate upon her mother's death. Through the survival claim, the estate sought to "recover noneconomic losses to compensate for pain, suffering, and inconvenience" to Ms. Birt as a result of the alleged medical malpractice. *See* Utah Code § 78B-3-410 (allowing an injured plaintiff to recover specified noneconomic losses in a medical malpractice action subject to a statutory cap).

¶56  The jury awarded damages for both causes of action. On the wrongful death claim, the jury awarded each of Ms. Birt's two

children $2 million in noneconomic damages associated with their mother's death, for a total award of $4 million. On the survival claim, the jury awarded the estate $1 million in noneconomic damages for the pain and suffering Ms. Birt experienced during the eight hours between the medical malpractice and her death; that award was reduced to $450,000 in accordance with the statutory cap on damages in survival actions arising from medical malpractice.[6]

¶57  On appeal, the doctors do not challenge the sufficiency of the evidence supporting the $4 million in damages awarded to the children to compensate them for the loss of their mother. Instead, the doctors challenge only the damages awarded to the estate on the survival claim.

¶58  Ms. Meeks attempts to justify those damages, in part, based on the consequences flowing from Ms. Birt's death. Ms. Meeks cites negligence cases in which we explain that "general damages attempt to measure the difference between what life would have been like without the harm done and what it is like as a result of the harm." *Pinney v. Carrera*, 2020 UT 43, ¶ 36, 469 P.3d 970 (cleaned up); *see also Judd v. Drezga*, 2004 UT 91, ¶ 4, 103 P.3d 135 (describing general damages as the "diminished capacity for the enjoyment of life," which is measured by "the difference between what life would have been like without the harm done by the medical professional, and what it is like with that additional burden"). From this language, Ms. Meeks extrapolates that the relevant comparison here is between the life that Ms. Birt would have enjoyed absent the doctors' negligence and the reality that she did not survive to enjoy that life.

---

[6] If the survival action arises from medical malpractice, the plaintiff's damages are limited by Utah's Malpractice Act. UTAH CODE § 78B-3-410. The Act provides that "an injured plaintiff may recover noneconomic losses to compensate for pain, suffering, and inconvenience," but "[t]he amount of damages awarded for noneconomic loss may not exceed . . . $450,000." *Id.* § 78B-3-410(1). The statutory cap does not apply to wrongful death claims. *Smith v. United States*, 2015 UT 68, ¶ 30, 356 P.3d 1249 ("We hold that the damages cap in section 78B-3-410 of the Malpractice Act is unconstitutional as applied to cases of wrongful death under article XVI, section 5 of the Utah Constitution.").

¶59 But the cases Ms. Meeks cites are personal injury cases brought by surviving tort victims. Consequently, those cases speak in terms of comparing life without the negligence to life with the negligence; they do not contemplate comparing life versus death to assess general damages in a survival action. Because survival statutes merely prevent the abatement of claims the injured plaintiff could have brought if she had lived, the general rule is that the estate can only recover for damages incurred between the time of the negligence and the time of death. *See, e.g.,* RESTATEMENT (SECOND) OF TORTS § 926 cmt. a (AM. L. INST. 1979) (explaining that in states that provide for separate survival and wrongful death actions, survival statutes "are interpreted as giving to the representative of the estate no more than the damages accruing before the death"). Indeed, according to the doctors, "all but five states prohibit" damages "to compensate the deceased for the pleasure he would have taken from his life had he lived," and the five divergent states "do so only by statutory enactment." (Quoting *Valenzuela v. City of Anaheim*, 29 F.4th 1093, 1094, 1096 (9th Cir. 2022).) Ms. Meeks has not undertaken an analysis of Utah's survival statute to show that it deviates from the general rule that an estate can recover only those damages suffered by a decedent prior to death.

¶60 More fundamentally, Ms. Meeks cannot rely on Ms. Birt's lost enjoyment of life caused by her death when Ms. Meeks stipulated to a jury instruction limiting the survival claim to pre-death damages. In instruction 29, labeled "Survival Claim," the district court told the jury, "If you decide that [the doctors'] fault was a cause of Ms. Birt's harm, you must award non-economic damages for the period of time that Ms. Birt lived after the injuries, regardless of whether [the doctors'] fault caused the death." All parties stipulated to that instruction. Accordingly, to determine whether the doctors were entitled to a directed verdict, we look solely to whether the evidence supported a reasonable inference that Ms. Birt suffered noneconomic damages during the eight hours between the negligent withdrawal of life-sustaining care and her death.

### B. Ms. Meeks Offered No Evidence of Pain and Suffering During the Relevant Time Frame

¶61 We next examine whether the evidence supported the award of damages on the survival claim. The doctors contend that the district court should have granted their motions for judgment

as a matter of law on the survival claim because Ms. Meeks offered no evidence to prove that her mother experienced pain and suffering as a result of the doctors' negligence. The doctors also argue that a plaintiff must put on expert medical testimony to prove that the injured person consciously experienced pain and suffering to recover noneconomic damages.

¶62   A party is entitled to judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." UTAH R. CIV. P. 50(a)(1). We review the district court's ruling on a motion for judgment as a matter of law "for correctness, and in doing so accept as true all testimony and reasonable inferences that support the jury's verdict." *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 38, 513 P.3d 729 (cleaned up). Accordingly, where the district court has denied the motion, we will overturn that decision "only if the appellant can demonstrate that there was no basis in the evidence, including reasonable inferences which could be drawn therefrom, to support the jury's verdict." *UMIA Ins., Inc.*, 2022 UT 21, ¶ 26 (cleaned up).

¶63   After finding the doctors liable for medical malpractice, the jury was charged with awarding "non-economic damages for the period of time that Ms. Birt lived after the injuries." Noneconomic damages reflect "the difference between what life would have been like without the harm done by the medical professional, and what it [was] like with that additional burden." *Judd*, 2004 UT 91, ¶ 4. Put another way, the estate had to prove that Ms. Birt's quality of life was worse during the eight-hour period before her death than it would have been in those same eight hours had the doctors not withdrawn life-sustaining care.

¶64   But Ms. Meeks offered no direct evidence of what Ms. Birt experienced in the eight-hour period before her death. She offered no medical evidence that Ms. Birt was experiencing pain or suffering in her final hours. And she offered no lay testimony about any outward manifestations that might indicate Ms. Birt was experiencing pain or suffering during that time.

¶65  Despite the lack of direct evidence, the district court concluded that "there was some evidence" that Ms. Birt experienced pain and suffering in the hours before her death. Specifically, the district court cited evidence that a few days before Ms. Birt's death, "the hospital staff conducted 'weaning trials' to attempt to get Ms. Birt off a ventilator." Ms. Meeks testified that

when the ventilator was removed in the weaning trials, her mother "struggled to breathe." Ms. Meeks testified about her mother's reaction in the weaning trials: "She would try to breath[e]. I don't know if you've ever seen someone try to breathe and they can't. They're writhing. I felt like she was in a lot of pain, moaning and groaning." Ms. Meeks described her mother as "[f]ighting for breath, moaning, not recognizing me. It seemed like she was in an extreme amount of pain. Like it seemed it—it just seemed excruciating to—what was happening to her." Like the weaning trials, the withdrawal of life-sustaining treatment also entailed removing the ventilator, and Ms. Meeks testified that her mother "couldn't breathe on her own." The court concluded that "a reasonable jury could infer from [Ms. Meeks's] earlier testimony about the weaning trials that withdrawing care caused Ms. Birt to suffer and experience discomfort."

¶66 Reviewing the district court's ruling for correctness, we conclude that the evidence regarding the weaning trials did not provide a legally sufficient evidentiary basis for the jury to award noneconomic damages on the survival claim. Because the weaning trials were conducted under different circumstances, that evidence did not support a reasonable inference that withdrawal of life-sustaining treatment affected Ms. Birt in a similar manner.

¶67 Ms. Meeks testified that, during the weaning trials, the medical team took her mother off the medicines that were keeping her sedated. She testified that "they had to take her off of what was keeping her asleep or not in pain." It was when those medications were withdrawn that Ms. Birt struggled to breathe and appeared in distress.

¶68 In contrast, when Ms. Birt was taken off the ventilator for the final time, she remained on palliative care, which included sedative medication and pain management specifically designed to eliminate Ms. Birt's discomfort. Ms. Meeks testified that, during the weaning trials, Ms. Birt was "trying to breathe" and "fighting for breath." But when Ms. Meeks was asked whether her mother tried to breathe when the doctors discontinued the ventilator for the final time, she answered "no."

¶69 Given the disparate circumstances under which the weaning trials occurred and the absence of any evidence that Ms. Birt suffered similar distress after life-sustaining treatment was withdrawn, the jury could not have reasonably based its award of noneconomic damages on the testimony cited by the district court.

In the absence of other evidence, the jury lacked a legally sufficient evidentiary basis to award damages on the survival claim. Because the claim fails for lack of evidence, we need not decide whether the survival statute permits recovery when the injured person is unconscious during the relevant period. We also need not decide whether expert testimony would be required to prove that an unconscious person could experience pain, suffering, or inconvenience. Here, no evidence whatsoever—expert or otherwise—supported a finding that Ms. Birt's quality of life was worse during the relevant eight hours than it would have been without the doctors' negligence. As a result, we reverse the denial of judgment as a matter of law on the survival claim.

## CONCLUSION

¶70 We affirm the district court's denial of a new trial because the jury instructions correctly set forth the elements of a medical malpractice claim. By instructing the jury that the plaintiff had the burden to prove "breach of the standard of care," the instructions implicitly required the jury to find that Ms. Meeks had proved both the relevant standard of care and that a breach had occurred.

¶71 However, we reverse the district court's ruling denying the doctors' motions for judgment as a matter of law on the survival claim. Ms. Meeks produced no evidence about what her mother experienced in the hours before her death that could support an award of noneconomic damages.

¶72 Affirmed in part and reversed in part.

———————