2024 UT App 8

# THE UTAH COURT OF APPEALS

A.W.,
Appellant,
*v.*
MILLIE MARELLI,
Appellee.

Opinion
No. 20220207-CA
Filed January 19, 2024

Third District Court, Salt Lake Department
The Honorable Andrew H. Stone
No. 190902075

Michael W. Young, Alan S. Mouritsen, and
Adam Bondy, Attorneys for Appellant

Emily Adams, Freyja Johnson,
Hannah K. Leavitt-Howell, and James I. Watts,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1 AW[1] alleges that when, as a teenager, she accused her stepfather of sexual abuse, her mother, Millie Marelli, maintained the abuse did not occur and told AW to never speak of it again. But speak of it AW did — to her biological father, who reported the abuse to authorities. Ultimately, AW was removed from Marelli's

---

1. Dear Reader: Judge Mortensen recognizes that you may be accustomed to the use of periods after each letter when we use initials in place of a party or witness name. However, he chooses to depart from that practice now and in the future. Removing the periods is both space saving and easier on the eyes.

home, and not long thereafter she cut off all contact with Marelli. When Marelli allegedly persisted over a number of years in making unwelcome contact, AW sued Marelli, claiming negligent and intentional infliction of emotional distress as well as negligent sexual abuse. Marelli moved for summary judgment on all claims, which the district court granted on the basis that AW failed to establish the required quantum of proof on each claim. AW appeals, and we affirm.

BACKGROUND[2]

¶2      AW alleges that in late 2008 or early 2009—when she was twelve years old—her stepfather (Stepfather) sexually abused her. When Marelli was hospitalized for several days while undergoing a medical procedure, she left AW in the care of Stepfather. According to AW, she became scared of the dark and Stepfather invited her to sleep in his bed. Once in the bed, Stepfather put his hand inside her underwear and began touching her genitals.

¶3      Shortly thereafter, AW disclosed the incident to Marelli. Marelli asked Stepfather what had happened, and he said that he awoke with his hand on AW and immediately withdrew it. He explained to AW that it was an accident and apologized. AW says Marelli and Stepfather told her the abuse never occurred and not to speak of it again. Marelli did not report the incident to authorities. Approximately one week later, AW told her father (Father) about the incident. Father immediately filed a complaint with the Division of Child and Family Services (DCFS) and sought a protective order against Stepfather. DCFS made a supported

---

2. We recite the facts of the case and draw all reasonable inferences in the light most favorable to AW as the nonmoving party. *See USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 33, 235 P.3d 749 ("[I]n a summary judgment proceeding, all facts and the reasonable inferences to be made therefrom should be construed in a light favorable to the non-moving party.").

finding that Stepfather presented a credible threat to AW's safety, but DCFS did not find evidence to support a finding that Marelli failed to protect AW. Father was eventually awarded sole legal custody of AW.

¶4 In a sworn declaration, Marelli's neighbor (Neighbor) stated that in late 2007 or early 2008, prior to the abuse AW alleged, she informed Marelli of an incident between her young daughter and Stepfather. Neighbor explained that her daughter came home from playing at Marelli's house with writing and pictures on her buttocks in the handwriting of an adult. When she asked her daughter about it, her daughter said that she and Stepfather were playing a game where the winner wrote on the other person. Neighbor spoke with Marelli about it, and Marelli "became defensive," denying Stepfather had "anything to do with it." Marelli blamed Neighbor's daughter for it, saying she had "offered herself" to Stepfather. Neighbor said her instincts told her to stop allowing her daughter to play at Marelli's house.

¶5 Since losing custody of AW in 2009, Marelli and AW have not seen one another outside of some initial court-ordered therapy sessions and a few brief encounters. AW claims that Marelli's alleged "denial [of the abuse] and victim blaming behavior are significant sources of [her] psychological disorders." Over the past decade, Marelli has continued to contact AW by sending letters, birthday gifts, and Facebook messages. AW claims she has repeatedly expressed her wishes not to have any contact at all. In Facebook messages from 2011, AW responded to Marelli with "STOP TALKING TO ME UNTIL U GET RID OF [STEPFATHER]!!!!!!!" and "STOP IT I WILL BLOCK THIS I AM NOT AFRAID TO SO STOP!!"

¶6 AW submitted many examples of communication she received from Marelli over the course of more than ten years. Those communications included handwritten letters and some photos with messages written on them, such as the following, which we present unedited for grammatical errors:

- [AW] give your mom a call with [heart drawing] always mom.

- I am sorry that you have forgotten the moments when you had with [Stepfather] to be your dad. I hope someday you will remember with all my heart and soul I loved you and will always love you because you are my girly for eternity.

- We all make mistakes in life, it is what we learn from them is the most important. Forgive yourself, forgive me I am truly sorry for all the many tears & fears you went through without your mothers warmest embrace . . . with love mom.

- [Stepfather] sure misses being your dad [heart drawing] be kind be forgiving be of great courage.

- Oh I miss my little girl that is all grown up. I love every min every hour every dam week month & year of your life. I hope to enjoy and embrace my lovely daughter again to look into your loving eyes and find you again. With love Mom.

- All my children was mislead away from the true. I have been told recently that I am not in reality but you see Reality isn't the truth.

¶7    Some of the photos sent to AW included pictures of both Marelli and Stepfather. Marelli also sent several publications and transcripts of public addresses from her religious leaders covering a wide range of topics.

¶8    AW also asserted that Marelli made two unwanted visits to her. The first occurred on AW's sixteenth birthday, when Marelli went to her school. The second was on her seventeenth birthday, when Marelli went to AW's house.

¶9    In 2019, AW commenced the present action against Marelli, claiming intentional infliction of emotional distress (IIED), negligent infliction of emotional distress (NIED), and negligent sexual abuse. Marelli moved for summary judgment on the three claims. Shortly after filing the summary judgment motion, Marelli sent AW a second box of letters, religious publications, and some of AW's old toys. AW argues that even though service of the complaint put Marelli on notice that her conduct caused AW distress, she nonetheless sent AW the box full of additional communication. AW filed a supplemental opposition to the motion, arguing that Marelli sent the communication with knowledge that AW did not want any contact with her. Marelli moved to strike the supplemental opposition, arguing that the Utah Rules of Civil Procedure allow for only supplemental authority not supplemental facts.

¶10    The district court allowed the supplemental opposition "in the interest of justice" and considered it in its decision. The district court granted Marelli's motion for summary judgment on all three of AW's claims. On the IIED claim, the court concluded that Marelli's conduct was not objectively outrageous. The court concluded that the NIED claim failed because AW did not show that Marelli's conduct objectively amounted to the "type of conduct 'especially likely' to cause severe and unmanageable emotional distress." Finally, on the negligent sexual abuse claim, the court concluded there was no support in the record that Stepfather had a history of inappropriate sexual behavior with children of which Marelli was aware or that Marelli's failure to report the alleged abuse harmed AW. AW appeals.

## ISSUE AND STANDARD OF REVIEW

¶11    On appeal, AW contends that the district court erred in granting Marelli's summary judgment motion with respect to each of her three claims. We review a grant of summary judgment for correctness, giving "no deference to the district court's legal

conclusions." *Ipsen v. Diamond Tree Experts, Inc.*, 2020 UT 30, ¶ 7, 466 P.3d 190 (cleaned up).

ANALYSIS

¶12 Summary judgment is appropriate where the moving party shows that "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). We conclude that the district court properly granted summary judgment disposing of all three of AW's claims against Marelli. We address the IIED, NIED, and negligent sexual abuse claims in turn.

I. IIED

¶13 The district court concluded that Marelli's conduct was not outrageous as a matter of law because all Marelli's "voluminous" communications with AW "plainly represent attempts by [Marelli] to reconcile with her daughter." AW contends that the district court erred because it (1) stepped into the role of the jury when determining that all the communications were an attempt to reconcile, (2) failed to consider other evidence of Marelli's outrageous behavior, and (3) applied an unnecessarily restrictive test for outrageous behavior. But we agree with the district court.

¶14 In addition to elements not at issue here,[3] to succeed on a claim for IIED, a plaintiff must show that the defendant's conduct "was outrageous and intolerable in that it offended generally accepted standards of decency and morality." *Prince v. Bear River*

---

3. "In Utah, a claim for IIED is actionable if: (i) the defendant's conduct is outrageous and intolerable; (ii) the defendant intends to cause emotional distress; (iii) the plaintiff suffers severe emotional distress; and (iv) the defendant's conduct proximately causes the plaintiff's emotional distress." *Chard v. Chard*, 2019 UT App 209, ¶ 57, 456 P.3d 776 (cleaned up).

*Mutual Ins. Co.*, 2002 UT 68, ¶ 37, 56 P.3d 524 (cleaned up). Our supreme court in *Retherford v. AT&T Communications of Mountain States, Inc.*, 844 P.2d 949 (Utah 1992), explained that "the standard Utah has adopted for determining whether the conduct of a defendant is sufficiently offensive to permit recovery is whether the defendant's actions offend against the generally accepted standards of decency and morality." *Id.* at 977 (cleaned up). The court clarified that this standard does not "weaken" that adopted by the Restatement (Second) of Torts, which uses the language *"beyond all possible bounds* of decency." *Id.* at 977 n.19; *see also* Restatement (Second) of Torts § 46 cmt. d (Am. L. Inst. 1965). The court made clear that the use of the language "generally accepted standards of decency" was not a change in the standard but only an acknowledgment that "all possible bounds" is difficult for any court to determine. *Retherford*, 844 P.2d at 977 n.19. The court emphasized that it "in no way softened the Restatement's requirement of extraordinarily vile conduct, conduct that is atrocious, and utterly intolerable in a civilized community." *Id.* (cleaned up). As made explicitly clear by the court, this standard still applies and is appropriate to apply in this case.

> Conduct is not necessarily outrageous merely because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal. To be considered outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair. Indeed, in order to prevail on a claim for IIED, a plaintiff must be able to prove that the defendant engaged in extraordinarily vile conduct, conduct that is atrocious, and utterly intolerable in a civilized community.

*Chard v. Chard*, 2019 UT App 209, ¶ 57, 456 P.3d 776 (cleaned up).

¶15 On a claim for IIED, "it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably

be regarded as so extreme and outrageous as to permit recovery." *Id.* (cleaned up). "However, where reasonable [minds] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Cabaness v. Thomas*, 2010 UT 23, ¶ 36, 232 P.3d 486 (cleaned up), *abrogated on other grounds by Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, 424 P.3d 897. "[A] district court is not required to draw every possible inference of fact, no matter how remote or improbable, in favor of the nonmoving party. Instead, it is required to draw all *reasonable* inferences in favor of the nonmoving party." *IHC Health Services, Inc. v. D&K Mgmt., Inc.*, 2008 UT 73, ¶ 19, 196 P.3d 588. "An inference is unreasonable if there is no underlying evidence to support the conclusion." *Medina v. Jeff Dumas Concrete Constr. LLC*, 2020 UT App 166, ¶ 21, 479 P.3d 1116 (cleaned up).

¶16    Looking at the "voluminous" examples of communication from Marelli to AW, we agree with the district court that the communications represent attempts—though at times poorly executed—of a mother to reconcile with her daughter. While statements such as "[Stepfather] sure misses being your dad" may not be the most sensitive way for Marelli to rebuild a relationship with her daughter, we cannot conclude that this and all the other communications can be reasonably said to violate "generally accepted standards of decency and morality." *See Prince*, 2002 UT 68, ¶ 37 (cleaned up). It is well within the court's authority to ascertain Marelli's intent when reasonable minds could not differ, as is the case here.

¶17    When a claim for IIED involves allegedly "ongoing and continuous conduct," the plaintiff "may recover for the entire course of [the] defendant's conduct." *See Cabaness*, 2010 UT 23, ¶ 27. Considering the whole of Marelli's conduct—including the facts that the correspondence was unwanted, that Marelli made a couple of unwelcome visits to AW over the last decade, and that Marelli sent AW correspondence after the present lawsuit commenced—does not change our determination that Marelli's

conduct cannot be reasonably found to evoke the outrage or revulsion required to succeed on a claim for IIED.

¶18 The communications and even visits by Marelli to AW represent a mother's attempt to build a relationship with her estranged daughter and, though insensitive at times, do not rise to the level of extraordinarily vile conduct required. Therefore, we affirm the district court's grant of summary judgment against AW's claim of IIED.

## II. NIED

¶19 AW also asserts that the district court erred in dismissing her NIED claim, arguing the court applied the wrong standard and overlooked contrary evidence.

¶20 Prior to 2018 in Utah, plaintiffs outside the "zone-of-danger"[4] had no means to recover for NIED. *Mower v. Baird*, 2018 UT 29, ¶¶ 75–85, 422 P.3d 837. *Mower* expanded "recovery for [NIED] in very limited circumstances" where "certain types of relationships, activities, and undertakings" exist that go to "the core of another person's emotional well-being and security." *Id.* ¶ 76. Because the case before us does not involve a zone-of-danger scenario, we apply the principles set forth in *Mower*. Under the *Mower* analysis, a plaintiff must establish that (1) the defendant owed a "traditional duty of reasonable care to the plaintiff" and (2) the "relationship, activity, or undertaking [is] of the type that

---

4. The zone-of-danger rule set forth in section 313 of the Restatement (Second) of Torts allows a plaintiff within the physical zone of danger resulting from a defendant's actions "to recover for emotional distress caused by fear for personal safety even though the plaintiff suffered no physical harm as a result of the defendant's breach of duty." *Mower v. Baird*, 2018 UT 29, ¶¶ 51–52, 422 P.3d 837 (cleaned up); *see also* Restatement (Second) of Torts § 313 (Am. L. Inst. 1965).

warrants a special, limited duty to refrain from causing severe emotional distress." *Id.* ¶ 78.

¶21 The second step requires an additional three-prong analysis asking the following:

> (1) Does the relationship, activity, or undertaking necessarily implicate the plaintiff's emotional well-being?; (2) Is there an especially likely risk that the defendant's negligence in the course of performing obligations pursuant to such relationship, activity, or undertaking will result in severe emotional distress?; and (3) Do general public policy considerations warrant rejecting a limited emotional distress duty where prongs one and two would otherwise find one to exist?

*Id.* ¶ 80 (cleaned up). [5]

¶22 The district court considered solely the second prong of this analysis; however, we find that analysis unnecessary as AW's claim fails on the first prong. The first prong is meant to ensure that the relationship, activity, or undertaking complained of is one "fraught with the risk of emotional harm to the plaintiff." *Id.* ¶ 81 (cleaned up). The Utah Supreme Court has made clear that "this prong can be met only in those very limited situations where the emotional well-being of others is at the core of, or is necessarily implicated by, the relationship, activity, or undertaking." *Id.* (cleaned up). The court did not delineate all possible

---

5. The district court and parties have assumed a duty existed by moving directly to step two of the *Mower* analysis. Therefore, for purposes of this appeal, we do the same and move directly to the three prongs under step two. However, this is not an indication of whether a duty did in fact exist under step one of the *Mower* analysis in this case.

relationships, activities, or undertakings that meet this requirement but instead indicated that courts should make this determination on a case-by-case basis with the recognition that this high threshold will be met in very few instances. *Id.*

¶23    As pointed out by AW, the court in *Mower* found that a nonpatient parent's claim against the therapist who caused the parent's child to develop false memories while treating the child for potential sexual abuse met this threshold as both an activity and relationship that implicates the parent's emotional well-being. *See id.* ¶ 97. The Restatement (Third) of Torts—upon which our supreme court based this rule and upon which courts in other jurisdictions have relied—identifies NIED as actions such as the mishandling of a corpse, an erroneous announcement of a death or illness, a physician negligently diagnosing a patient with a serious disease, a hospital losing a newborn infant, an employer mistreating an employee, and a spouse mentally abusing the other spouse. *See* Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 47 cmt. f (Am. L. Inst. 2012); *see also Mower*, 2018 UT 29, ¶ 70; *see, e.g.*, *Hedgepeth v. Witman Walker Clinic*, 22 A.3d 789, 819–20 (D.C. 2011) (applying NIED to a patient receiving a false HIV diagnosis); *Doe Parents No. 1 v. State*, 58 P.3d 545, 580–82 (Haw. 2002) (applying NIED to a school reinstating a teacher accused of child molestation without sufficient investigation of the claim); *Boorman v. Nevada Mem'l Cremation Society*, 236 P.3d 4, 7–8 (Nev. 2010) (en banc) (applying NIED to mortuary's negligent handling of a loved one's corpse).

¶24    Such a relationship, activity, or undertaking is not present here. While sexual abuse, particularly within one's own home, is a serious and clearly harmful occurrence for a child, the activity that AW argues supports her NIED claim is Marelli's continued communications with her, including two brief visits, over the decade following the alleged abuse. While this activity, which we view as attempts by a mother to reconcile with her daughter, may evoke strong emotions, as the district court pointed out, it is not "fraught with the risk of emotional harm." *Mower*, 2018 UT 29,

¶ 81 (cleaned up). The expansion of NIED in *Mower* was extremely limited to the narrow circumstances explained above, and allowing recovery here would expand that rule exponentially. An estranged relationship with a parent is too ubiquitous to meet the specific requirement set out by our supreme court that this rule will be met in very few instances. *See id.* Applying NIED to the facts before us would open the door to a seemingly endless number of possible circumstances where communication between a parent and child is strained, hurtful, or unwanted. Thus, the activity here does not rise to the level of those "very limited situations where the emotional well-being of others" lies "at the core." *Id.* (cleaned up). We therefore affirm the district court's grant of summary judgment against AW's claim of NIED.

### III. Negligent Sexual Abuse

¶25     AW argues that Marelli was negligent in preventing the alleged sexual abuse AW suffered because Marelli had previous warning about Stepfather's "inappropriate behavior around children."[6] The district court found legally insufficient support in the record for this contention—a conclusion with which we agree. To support this claim, AW relies on Neighbor's declaration that Stepfather wrote on her daughter's buttocks. AW argues that the district court inappropriately weighed and discounted the declaration, particularly by calling the declaration "one somewhat vague report of inappropriate conduct."

¶26     In addition to other factors, a negligence claim requires foreseeable injury to establish whether a defendant had a duty "to conform to a particular standard of conduct toward another."

---

6. In her complaint, AW asserted that Marelli's failure to report Stepfather's sexual abuse to the proper authorities also constituted negligence—a claim which the district court determined failed. AW does not raise this issue on appeal; therefore, we will not address it.

*Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 19, 215 P.3d 152 (cleaned up). "What is necessary to meet the test of negligence . . . is that [the harm] be reasonably foreseeable, not that the particular accident would occur, but only that there is a likelihood of an occurrence of the same general nature." *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1346 (Utah 1993) (cleaned up); *accord Normandeau*, 2009 UT 44, ¶ 20. Duty—which includes the issue of foreseeability—is "a purely legal issue for the court to decide." *Normandeau*, 2009 UT 44, ¶ 17.

¶27 While summary judgment is appropriate only "when, viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law," a plaintiff "is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture." *Kranendonk v. Gregory & Swapp, PLLC*, 2014 UT App 36, ¶ 15, 320 P.3d 689 (cleaned up), *cert. denied*, 329 P.3d 36 (Utah 2014). "When the facts are so tenuous, vague, or insufficiently established that determining an issue of fact becomes completely speculative, the claim fails as a matter of law, and summary judgment is appropriate." *Hardy v. Sagacious Grace LC*, 2021 UT App 23, ¶ 21, 483 P.3d 1275 (cleaned up); *see also Nelson v. Target Corp.*, 2014 UT App 205, ¶ 25, 334 P.3d 1010 ("A plaintiff cannot avoid summary judgment based on doubtful, vague, speculative or inconclusive evidence." (cleaned up)).

¶28 Although certainly disconcerting, the singular incident described in Neighbor's declaration is not enough to make it reasonably foreseeable to Marelli that Stepfather would sexually abuse AW and thereby leaves AW's claim in the realm of vague speculation, which is appropriate for summary judgment. First, the evidence AW points to suggests that the incident with Neighbor's child was an isolated event. Second, writing on a child's buttocks during a game, though deplorable and entirely inappropriate, is markedly different than lying in bed with and touching a child's genitals under her clothing. *See McGuire v.*

*Cooper*, 952 F.3d 918, 922–23 (8th Cir. 2020) (concluding that summary judgment was appropriate in a case involving a sexual assault as "the prior instances of sexual misconduct [were] not similar in kind or sufficiently egregious in nature to demonstrate a pattern of sexual assault"); *Bjerke v. Johnson*, 727 N.W.2d 183, 190 (Minn. Ct. App. 2007) ("The foreseeability of a sexual assault often hinges on whether the defendant was aware of prior similar behavior by the third party. Indeed, sexual assault will rarely be deemed foreseeable in the absence of prior similar incidents." (cleaned up)), *aff'd*, 742 N.W.2d 660 (Minn. 2007).[7] Finally, AW

---

7. To support her argument that Marelli should have foreseen the threat that Stepfather posed, AW cites *O.L. v. R.L.*, 62 S.W.3d 469 (Mo. Ct. App. 2001), which states that "[a]s the gravity of possible harm from sexual molestation of a young child is high, we recognize that it may require a lesser showing of likelihood than with other types of injuries." *Id.* at 477. However, in *O.L.*, the court concluded that summary judgment was appropriate as the harm was not foreseeable where a grandmother left her grandchild with the grandfather, who then sexually abused the child. *Id.* at 481. The evidence presented included the fact that the grandfather physically abused the grandmother decades previously and broke her nose, which the child's father knew about and considered "so remote in time that he had no qualms" with leaving his child in the grandfather's care. *Id.* at 478–79. The parents additionally presented evidence that fifteen years prior to the abuse of the child, the grandfather subscribed to *Playboy* magazine for one year. *Id.* at 479. Finally, the parents relied on speculative evidence that the grandfather sought extramarital sexual liaisons through advertisements and at a social gathering. *Id.* The court concluded that the evidence presented was "so tenuous that it [could not] give rise to a genuine dispute as to whether a reasonable person knew or should have known that [the] grandfather might pose a danger to [the grandchild] if she was left unsupervised in his care, thereby breaching a duty of care." *Id.* at 481. While the evidence here, namely the incident involving Neighbor's daughter, is much

(continued…)

points to no evidence that Stepfather had taken any liberties with or made any inappropriate advances toward her prior to the incident at issue here. *See Doe v. Franklin*, 930 S.W.2d 921, 924–29 (Tex. App. 1996) (concluding that summary judgment was not appropriate on a negligence claim where a grandmother left her granddaughter alone with the grandfather *after* the granddaughter told the grandmother he had sexually abused her).[8] Therefore, seeing insufficient evidence in the record that

---

more related in time and conduct to the abuse AW suffered, it is still tenuous as we have discussed and does not meet even a requirement of a "lesser showing of likelihood," *id.* at 477, if that standard were to apply in Utah.

8. AW cites *Doe ex rel. Pike v. Pike*, 424 F. Supp. 3d 170 (D. Mass. 2019), to support her argument that a reasonable jury could conclude the harm of sexual abuse was reasonably foreseeable. The case is unpersuasive. In *Pike*, a granddaughter in the care of her grandparents suffered sexual abuse from her grandfather. *Id.* at 172. The court concluded that summary judgment was inappropriate because, viewing the evidence in the light most favorable to the nonmoving party, a jury could find that "a reasonable person in [the grandmother's] position would have or should have known that [the grandfather] was abusing [the granddaughter]." *Id.* at 182. As AW points out in her brief, the court based this determination on such evidence as "[the grandmother's] own observations of [the grandfather's] conduct toward [the granddaughter] and their other grandchildren, including observing him playing the radio game [which involved twisting the children's nipples], engaging in the tickle game to excess, being in the vicinity when the abuse occurred and 'locking eyes' with [the granddaughter] while she sat next to [the grandfather] on the couch and his hands were under the blanket hidden from view." *Id.* This evidence involved multiple incidents and red flags that the grandmother chose to ignore, unlike the singular incident here when Stepfather allegedly wrote on

(continued…)

Marelli should have reasonably foreseen the threat of Stepfather sexually abusing AW, we affirm the district court's grant of summary judgment on AW's claim of negligent sexual abuse.

## CONCLUSION

¶29   We conclude that the district court correctly granted Marelli's motion for summary judgment, thereby disposing of all three of AW's claims against her.

¶30   Affirmed.

_____

Neighbor's daughter. Furthermore, the *Pike* court additionally based its decision on the evidence, which AW fails to note, that the grandmother knew the grandfather had been accused of sexual assault previously. *Id.* With all this evidence taken into account, we do not view *Pike* as analogous or persuasive.