# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SARAH ANN BERTOLA and | ) | |
| DALLAS BERTOLA, | ) | |
| Co-Personal Representatives of the | ) | C.A. No. N21C-01-115 FJJ |
| Estate of A.M.B., Deceased | ) | |
| and in their own right | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FISHER-PRICE, INC., and | ) | |
| MATTEL, INC., | ) | |
| Defendants. | ) | |

Submitted: April 11, 2024
Decided: April 21, 2025

## <u>OPINION AND ORDER</u>

*On Defendants' Motion for Summary Judgment*
**DENIED IN PART AND GRANTED IN PART.**

*Robert J. Leoni, Esquire,* Shelsby & Leoni, Newark, Delaware and *Alan M. Feldman, Daniel J. Mann,* and *Edward S. Goldis, Esquires*, (Pro Hac Vice) Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig, LLP, Philadelphia, Pennsylvania, *Attorneys for Plaintiffs*.

*Jennifer C. Wasson, Esquire, and Ryan D. Kingshill, Esquire*, Potter Anderson & Corroon, LLP, Wilmington, Delaware, and *Amy Furness, Esquire,* (Pro Hac Vice) Carlton Fields, P.A., Miami, Florida and *Robert Shannon, Esquire*, (Pro Hac Vice) Carlton Fields, P.A., Atlanta, Georgia, *Attorneys for Defendants*.

**Jones, J.**

## INTRODUCTION

Plaintiffs, Sarah Ann Bertola and Dallas Bertola on behalf of themselves and as representatives of A.M.B's estate ("Plaintiffs"), bring product liability claims against Defendants, Fisher-Price and Mattel, Inc ("Defendants"), for the death of their infant child, A.M.B. Plaintiffs allege A.M.B. asphyxiated and suffocated while sleeping in Defendants' Rock 'N Play Sleeper (hereinafter "RnP"). Plaintiffs claim product deficiencies and improper marketing and sale of the RnP as a safe product for an infant to sleep in unattended caused A.M.B's death. Defendants bring the instant Motion for Summary Judgment asking *inter alia* to find Plaintiffs' claims lack causation.

## FACTS AND PROCEDURAL HISTORY

A. The Rock 'N Play Sleeper ("RnP")

The RnP was sold as "an inclined sleeping product" intended for day or overnight sleep "in which infants are placed supine (on their backs) at less than a 30-degree angle from the horizontal."[1] The product consists of a "free-standing metal rocking frame, an attached rigid plastic backing, a removable seat pad with fabric cover, and a three-point belt restraint system."[2] The restraint system "secured a strap between the infant's legs and across the torso."[3]

---

[1] Docket Item ("D.I.") 164, Exhibit ("Ex.") B, Aff. of Jennifer Mussell, 1/30/24.
[2] *Id.*
[3] *Id.*

When sold at retail, the RnP came in a box, unassembled, and included an instruction manual with product safety warnings.[4] Warnings on a label attached to the RnP state under "FALL HAZARD" to "**Always** use restraint system," and under SUFFOCATION HAZARD to "Only **use the pad provided** by Fisher-Price" and "**Never** place extra padding under or beside infant."[5]

B. The Incident

Sarah Bertola, A.M.B.'s mother, received her RnP as a baby shower gift from her sisters.[6] In the evening of January 4, 2017, Ms. Bertola put A.M.B. to sleep in the RnP on her back and swaddled in a blanket.[7] The restraint system was not being used due to A.M.B.'s swaddle hindering it.[8] The RnP was located in A.M.B.'s nursery.[9] Ms. Bertola then went to her bedroom to watch TV with her husband, A.M.B.'s father, Dallas Bertola.[10] Around 2:00 in the morning, Ms. Bertola checked on A.M.B, who appeared to be fine, and placed a blanket around her waist.[11] At 10:10 in the morning on January 5, 2017, Ms. Bertola woke up concerned she had not heard A.M.B.[12] When she went to check on A.M.B., she found her "slumped down in the RnP with her head tilted downwards to the right and her chin on her

---

[4] D.I. 164, Ex. C, Aff. of Johanna D. Roblee, 2/19/24.
[5] *Id.*, Ex. D.
[6] D.I. 164 p. 8.
[7] D.I. 194 p. 12.
[8] D.I. 164 p. 9.
[9] *Id.*
[10] *Id.*
[11] D.I. 194 p. 12-13.
[12] *Id.* at 13.

3

shoulder."[13]  The blanket Ms. Bertola had placed on A.M.B. in the middle of the night was now "covering A.M.B.'s face up to the pacifier that was in her mouth."[14] Ms. Bertola yelled out to her husband in their bedroom and attempted CPR.[15] Emergency authorities were called to the scene but could not revive A.M.B.[16]  The infant's death was ruled by the autopsy report as a "Sudden Unexplained Infant Death" with a cause that "Could Not Be Determined."[17]

## C. Procedural History

Defendant filed the instant Motion for Summary on February 1, 2024.[18]  Full briefing has concluded with Plaintiffs filing their Answering Brief in Opposition on March 11, 2024[19] and Defendants filing their Reply Brief on April 11, 2024.[20]  The larger than usual period of time between briefing and this opinion is due to continuances in this case and issues in this litigation generally.

## CHOICE OF LAW

The accident initiating this case occurred in Utah.  The parties agree that Utah substantive law applies to this case,[21] and this Court will so apply it.  The general

---

[13] *Id.*, Ex. BB, Sarah Bertola Dep. at 256-57.
[14] *Id.*, Ex. BB at 191-92.
[15] *Id.*
[16] *Id.*
[17] D.I. 164 p. 1, Ex. A at 1.
[18] D.I. 164.
[19] D.I. 194.
[20] D.I. 213.
[21] *See* D.I. 145, Stipulation and Order on Choice of Law.

rule is to apply procedural law of the forum.[22] In the instant case, the forum is Delaware; therefore, Delaware procedural law is applicable.

## STANDARD OF REVIEW

Superior Court Civil Rule 56(c) states a party seeking summary judgment must show "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[23] A genuine issue of material fact is one that "may reasonably be resolved in favor of either party."[24] The court views the evidence provided "in a light most favorable to the non-moving party."[25] The initial burden is on the moving party to show there are no genuine issues of material fact.[26] The burden then shifts to the non-moving party to show there is at least one material issue of fact in dispute.[27] The court must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," in determining whether there is a genuine issue as to any material fact, and the court must "accept all undisputed factual assertions and accept the nonmoving party's version of any disputed facts."[28] However, any factual inferences made in favor of the non-moving party must be reasonable.[29]

---

[22] *Chaplake Holdings, Ltd. v. Chrysler Corp.*, 766 A.2d 1, 5 (Del. 2001).
[23] Del. Super. Ct. Civ. R. 56(c).
[24] *Saunders v. Lightwave Logic, Inc.*, 2024 WL 4512227, at *6 (Del. Super. Oct. 17, 2024).
[25] *Gibson v. Metro. Grp. Prop. And Cas. Ins. Co.*, 2017 WL 5606714, at *2 (Del. Super. Nov. 15, 2017).
[26] *Id.*
[27] *Id.*
[28] *Coker v. Tenney-Andrews*, 2016 WL 6659500, at *2 (Del. Super. Nov. 10, 2016).
[29] *Smith v. Haldeman*, 2012 WL 3611895, at *1 (Del. Super. Aug. 21, 2012).

## ANALYSIS

I.     <u>There is a Genuine Dispute of Material Fact as to Whether the Design of the Rock 'N Play Sleeper Was the Proximate Cause of A.M.B.'s Death.</u>

The Utah Product Liability Act ("UPLA") governs "any action for damages for personal injury, death, or property damage allegedly caused by a defect in a product."[30] A product liability claim embraces "all actions seeking money damages for injury to people or property resulting from defective products."[31] The damage pled by the party bringing the product liability claim must have been caused by the purportedly defective product.[32]

Directing the Court to the arguments discussed in their *Daubert* motions,[33] Defendants argue Plaintiffs' expert testimony concerning the RnP's design is speculative and conjectural. Defendants ask the Court to grant summary judgment on this basis because without reliable expert testimony on causation, the Plaintiffs cannot establish a claim.[34] Plaintiffs contend their experts' opinions are based on ample scientific support and point the Court to the arguments made in their responses to Defendants' *Daubert* motions.[35]

---

[30] Utah Code § 78B-6-703(1).
[31] *Utah Local Gov't Tr. v. Wheeler Mach. Co.*, 199 P.3d 949, 951 (Utah 2008).
[32] *Id.* at 952.
[33] *See* Defendants' Motion to Exclude Plaintiffs' Expert, D.I. 146 (Darlene Calhoun); 148 (Wayne Ross); 152 (Dennis Rosen); 167 (Benjamin Hoffman); 168 (Erin Mannen).
[34] D.I. 164 p. 14.
[35] *See* Plaintiff's Response in Opposition to Defendant's Motion to Exclude Plaintiffs' Expert D.I. 189 (Darlene Calhoun),190 (Dennis Rosen), 191 (Wayne Ross), 193 (Erin Mannen), 195 (Benjamin Hoffman).

In a decision issued contemporaneously with this issue, this Court has denied Defendants' Motions to Exclude the Testimony of various Plaintiffs' experts who establish causation.[36]

Based on these decisions, the Court finds Plaintiffs provided sufficient, reliable expert testimony to provide a legitimate factual question of causation to a jury. Therefore, Defendant's Motion for Summary Judgment as to causation is **DENIED**.

II. <u>Plaintiffs Cannot Raise a Negligent Infliction of Emotional Distress ("NIED") Claim Because They Were Not in the Zone of Danger and Utah's Limited, Special Duty Rule is Inapplicable.</u>

Under a zone of danger theory, the tort of negligent infliction of emotional distress ("NIED") only allows recovery for third parties put in "actual peril" from the defendant's breach of duty.[37] The zone of danger rule allows a "plaintiff who was within the zone of danger to recover for emotional distress caused by fear for personal safety even though the plaintiff suffered no physical harm as a result of the defendant's breach of duty."[38] In *Hansen v. Sea Ray Boats*, the Utah courts "unequivocally adopted the zone of danger rule" and "rejected any approach that

---

[36] *See* Opinion and Order on Defendants' Evidentiary Motions.
[37] *Hansen v. Sea Ray Boats, Inc.*, 830 P.2d 236, 239-40 (Utah 1992).
[38] *Id.* at 240.

7

allows plaintiffs who are not within the zone of danger to recover for emotional distress caused by witnessing another's injury."[39]

Applying the zone of danger rule, Defendants argue Plaintiffs have no negligent infliction of emotional distress claim because it is undisputed that Plaintiffs were asleep in another room when A.M.B. passed nor did Plaintiffs state they personally felt in danger.[40] Plaintiffs direct the Court to the Utah Supreme Court decision in *Mower v. Baird* to argue that Plaintiffs may recover under negligent infliction of emotional distress without being in the zone of danger.[41]

In *Mower*, the Utah Supreme Court laid out a two-part analysis to determine whether a class of defendants owe a limited emotional distress duty to a class of plaintiffs.[42] The analysis first asks "does the defendant owe a traditional duty of reasonable care to the plaintiffs?"[43] To answer this question, the Court refers to the traditional duty factors discussed in *B.R. ex rel. Jeffs v. West*.[44] These factors include:

> (1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) public policy

---

[39] *Boucher By and Through Boucher v. Dixie Med. Ctr., a Div. of IHC Hosps., Inc.*, 850 P.2d 1179, 1182 (Utah 1992) (citing *Hansen*, 830 P.2d at 241).
[40] D.I. 164 p.17.
[41] D.I. 194 p. 16-20.
[42] 422 P.3d 837, 857 (Utah 2018). The Court bases, but does not fully adopt, this newfound, limited exception on the Restatement (Third) of Torts "recogniz[ing] limited situations where defendants will also owe the plaintiff a limited duty to act with reasonable care when placing one at risk of serious emotional harm" in scenarios where the party attempting to recover was not within the zone of danger. *Id.* at 850, 857 (quoting Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 47 cmt. g (Am. Law Inst. 2012)).
[43] *Mower*, 422 P.3d at 856.
[44] *Id.* (citing *B.R. ex rel. Jeffs v. West*, 275 P.3d 228 (Utah 2012)).

as to which party can best bear the loss occasioned by the injury; and (5) other general policy considerations.[45]

The first factor considers whether the alleged conduct was a misfeasance or a nonfeasance. "Acts of misfeasance, or active misconduct working positive injury to others, typically carry a duty of care."[46] "[N]onfeasance – passive intuition, a failure to take positive steps to benefit others, or to protect them from harm not create by any wrongful act of the defendant – only gives rise to a duty when a special legal relationship exists."[47] Therefore, a plaintiff is not required to show a special legal relationship when a plaintiff alleges a defendant partook in misfeasance; however, if a plaintiff alleges a defendant conducted nonfeasance, then existence of a special legal relationship is required.

Plaintiffs allege Defendants acted in misfeasance as well as nonfeasance by creating, marketing, and selling a "dangerous infant product" and failing to warn about potential hazards with the product.[48] Plaintiffs argue Defendants' deprivation of "normal opportunities for self-protection" by marketing a safe product formed a special legal relationship between the parties.[49] However, Plaintiffs do not need to establish the relationship between the parties because Plaintiffs allege affirmative acts of misfeasance by Defendants.

---

[45] *Mower*, 422 P.3d at 843 (citing *Jeffs*, 275 P.3d 228).
[46] *Mower*, 422 P.3d at 843.
[47] *Id.*
[48] D.I. 194 p. 18.
[49] *Id.*

9

The foreseeability analysis "focuses on the general relationship between the alleged tortfeasor and the victim and the general foreseeability of the harm rather than the specifics of the alleged tortious conduct such as the specific mechanism of the harm."[50] The question this factor calls for is "whether a category of cases includes individual cases in which the likelihood of some type of harm is sufficiently high that a reasonable person could anticipate a general risk of injury to others."[51]

Plaintiffs urge the foreseeability in this case was known by the Defendants because Defendants knew of and ignored the AAP Safe Sleep Guidelines as well as other fatalities linked to the RnP.[52] Even without knowledge of potential RnP safety deficiencies, the manufacturer of infant products can reasonably anticipate harm to an infant using their product creates a foreseeable risk to the parents.[53]

The fourth factor centers on "whether the defendant is best situated to take reasonable precautions to avoid injury."[54] Weighing Defendants' role as designer and manufacturer of the product versus Plaintiffs' use of the product as a consumer, Defendants have the superior role in ensuring the product is safe.

---

[50] *Mower*, 422 P.3d at 844 (quoting *Jeffs*, 275 P.3d at 235).
[51] *Mower*, 422 P.3d at 844 (quoting *Jeffs*, 275 P.3d at 235-36).
[52] D.I. 194 p. 19.
[53] *See Mower*, 422 P.3d at 844-45 (finding the injury to nonpatient, parents of a child harmed by a rejected therapy technique is foreseeable).
[54] *Mower*, 422 P.3d at 845 (quoting *Jeffs*, 275 P.3d at 237).

10

Considering these factors, the Court finds that, under the *Jeffs* factors, Defendants owed a traditional duty to Plaintiffs. However, the analysis does not end there.

The second inquiry requires the Court to consider whether "the relationship, activity, or undertaking [is] of the type that warrants a special, limited duty to refrain from causing severe emotional distress?"[55] This step requires a three-prong analysis asking:

> (1) does the relationship, activity, or undertaking "necessarily implicate the plaintiffs' emotional well-being?"; (2) is there "an especially likely risk" "that the defendant's negligence in the course of performing obligations pursuant to such relationship[, activity,] or undertaking will result in [severe] emotional distress?"; and (3) do general public policy considerations warrant rejecting a limited emotional distress duty where prongs one and two would otherwise find one to exist?[56]

To pass muster with the first prong, the relationship must be one "fraught with the risk of emotional harm" to the plaintiff.[57] "This prong can be met only in those very limited 'situations where the emotional well-being of others is at the core of, or is necessarily implicated by, the [relationship, activity, or] undertaking."[58] This analysis is meant to be on a "case-by-case basis" and requires meeting a "high threshold . . . met in very few instances."[59]

---

[55] *Id.* at 856.
[56] *Id.* at 856-57 (quoting *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810 (D.C. 2011)).
[57] *Mower*, 422 P.3d at 857.
[58] *Id.* (quoting *Hedgepeth*, 22 A.3d at 814).
[59] *A.W. v. Marelli*, 543 P.3d 786, 792 (Utah Ct. App. 2024).

In *A.W. v. Marelli*, the Utah Court of Appeals found an NIED claim could not extend to a mother's continued, unwanted communications with her estranged daughter.[60] The Court acknowledged that these communications were a result of the daughter's suffered sexual abuse by her stepfather but concluded that the core issue of the claim was the mother's attempted reconciliation with her daughter.[61] In making this decision, the Court recognized the Restatement (Third) of Torts' list of NIED claim example including "mishandling of a corpse, an erroneous announcement of a death or illness, a physician negligently diagnosing a patient with a serious disease, a hospital losing a newborn infant, an employer mistreating an employee, and a spouse mentally abusing the other spouse."[62] Considering the Restatement and *Mower*'s limited application, the Court declined to expand NIED to cover the daughter's claim.[63]

In view of this case law, the Court does not find that *Mower*'s limited use applicable to the instant case. Plaintiffs' claim fails the first prong of the second part of the analysis. The Plaintiffs' emotional well-being is not at the core of their claim in the way it is in the narrow cases in the Restatement and *Mower*.

---

[60] *Id.* at 793.
[61] *Id.*
[62] *Id.* (quoting Restatement (Third) of Torts § 47 cmt. f).
[63] *A.W.*, 543 P.3d at 793.

12

Because parties do not dispute Plaintiffs were not within the zone of danger, the Court **GRANTS** Defendant's partial summary judgment for Plaintiff's NIED claim.

III.   <u>Plaintiffs Cannot Recover Pain and Suffering, Emotional Distress, and Mental Anguish Damages Under a Survival or Wrongful Death Action.</u>

Because the Court denied Plaintiffs' NIED claim, Plaintiffs cannot recover in their personal capacities for pain and suffering, emotional distress, or mental anguish under that claim.  However, Plaintiffs also bring wrongful death and survival actions in their representative capacities.[64]

A survival statute "provides for the continuance of an injured person's cause of action in order to preserve any interests which have accrued in the recovery of damages to his estate should he die prior to the resolution of the suit."[65]  Under Utah law, heirs are limited in what they can recover under the survival statute.  "Heirs may recover on behalf of the decedent certain special damages but may not recover for the pain and suffering of the decedent and similar components of recovery falling within the category of general damages."[66]  These special damages are limited to those "sustained by the decedent during his lifetime that did not require the testimony of the decedent to ascertain."[67]  Further, the survival statute does not allow

---

[64] D.I. 1 ¶¶ 156-65.
[65] *Meeks v. Peng*, 545 P.3d 226, 337 (Utah 2024) (quoting *Est. of Berkemeir ex rel. Nielsen v. Hartford Ins. Co. of the Midwest*, 67 P.3d 1012, aff'd 106 P.3d 700 (Utah 2003)).
[66] *Bybee v. Abdulla*, 189 P.3d 40, 48-49 (Utah 2008).
[67] *Id.* at 48.

heirs to recover damages stemming from injuries they faced because of the decedent's death.[68]

Plaintiffs cite to *Pinney v. Carrera*[69] to support their argument that they can recover general damages under the survivor statute.[70] Noted in *Meeks v. Peng*, the survivor action in *Pinney* was brought by a surviving tort victim, and the Court evaluates the comparison of "life without negligence to life with negligence."[71] The instant case, as was the case in *Meeks*, considers "life versus death to assess general damages in a survival action."[72]

"[T]he general rule is that the estate can only recover for damages incurred between the time of the negligence and the time of death."[73] Therefore, Plaintiffs may recover under a survival action for general damages, including pain and suffering, prior to A.M.B.'s death but cannot recover based on Plaintiffs' personal pain and suffering, mental anguish, or emotional distress.

"Wrongful death claims acknowledge that the survivors 'suffer a direct loss to themselves' when their loved ones die from a wrongful act. Accordingly, the damages recovered in wrongful death actions are meant to compensate the harm

---

[68] *Id.* at 49.
[69] 469 P.3d 970 (Utah 2020).
[70] D.I. 194 p. 21.
[71] *Meeks*, 545 P.3d at 239. *See Pinney*, 469 P.3d at 980-81 (asking jury to examine general damages under factors including "the extent to which [the plaintiff] has been prevented from pursuing [his or her] ordinary affairs," "the extent to which [the plaintiff] has been limited in [the] enjoyment of life," and "whether the consequences of these injuries are likely to continue, and for how long.")
[72] *Id.*
[73] *Id.* (citing Restatement (Second) of Torts § 926 cmt. a (Am. L. Inst. 1979)).

done to the survivors because of the death."[74]  "Damages in a wrongful death suit include '[loss of] financial support furnished; loss of affection, counsel, and advice; loss of deceased's care and solicitude for the welfare of the family; and loss of the comfort and pleasure the family of [the] deceased would have received."[75]

In the Answering Brief, Plaintiffs agree with Defendants' application of *Oxedine v. Overturf* and *Feldman v. Salt Lake City Corporation.*[76]  These two cases acknowledge the types of non-economic losses recovered under a wrongful death action, including loss of society, love, companionship, protection, and affection.[77] While Plaintiffs use these cases to support the notion that they can bring pain and suffering, mental anguish, and emotional distress damages under a wrongful death action, these cases actually do not align with that argument.  The losses attributed to a wrongful death action are not the same as the pain and suffering, mental anguish, and emotional distress losses Plaintiffs raise.  Therefore, Plaintiffs cannot bring these losses under a wrongful death act.

For the above reasons, Defendants' Motion is **GRANTED** as to wrongful death damages and **DENIED** as to survival action general damages A.M.B. suffered in the time between the alleged negligence and A.M.B.'s passing.

---

[74] *Meeks*, 545 P.3d at 237 (quoting *Meads v. Dibble*, 350 P.2d 853, 855 (Utah 1960))
[75] *Meeks*, 545 P.3d at 237 (quoting *Est. of Faucheaux v. City of Provo*, 449 P.3d 112, 116 (Utah 2019)).
[76] D.I. 194 p. 21.
[77] *See Feldman v. Salt Lake City Corp.*, 484 P.3d 1134, 1139 (Utah 2021); *Oxedine v. Overturf*, 973 P.2d 417, 422 (Utah 1999).

15

IV. The Parties Do Not Raise An Issue Over Specific Materials Used in the RnP.

Defendants opine Plaintiffs' references in their Complaint to the "makeup," "bedding," and "padding" of the RnP causing any danger or defect in the product is not supported by expert testimony. Defendants ask the Court to grant summary judgment on this basis.[78] Plaintiffs' Response assures the Court they are not arguing a specific material used in the RnP caused A.M.B.'s death, but rather the overall design of the RnP caused the fatality.[79] Plaintiffs state:

> [t]o the extend that Defendants' argument relates solely to the specific materials selected as opposed to the overall design of the RNPS, then Defendants' motion for partial summary judgment can be granted as to "the materials" used in the RNPS, as there are no claims that the specific materials used by Defendants was the cause of A.M.B.'s death.[80]

Since the parties do not dispute as to the selection of the specific materials of the RnP *not* causing A.M.B.'s death, Defendant's Motion as to this issue is **MOOT.**

V. There are Genuine Issues as to Plaintiffs' Fraud, Fraudulent Concealment, and Negligent Misrepresentation Claims.

A. Utah's Clear and Convincing Burden of Proof Applies.

Burden of proof is a procedural issue which the forum will apply its law to unless the "primary purpose of the relevant rule of the state of the otherwise applicable law is to affect decision of the issue rather than to regulate conduct of the

---

[78] D.I. 164 p. 20-21.
[79] D.I. 194 p. 22.
[80] *Id.*

16

trial."[81]  In *Meyers v. Intel Corporation* and *Monsanto Company v. Aetna Casualty and Surety Company*, the Delaware courts applied the foreign state's burden of proof because the heightened allocation was meant to impact the outcome of trial.[82]

Utah evidentiary law requires fraud be proven by clear and convincing evidence; whereas, in Delaware, the burden is a lower preponderance of the evidence standard.[83]  To determine which burden of proof to apply, the Court must inquire into whether Utah's clear and convincing burden is "inseparably interwoven with substantive rights" under Utah law.[84]  "When a rule singles out a narrow issue and gives the issue special treatment, the rule may be designed to affect the trial's outcome."[85]

Utah's typical civil burden of proof is preponderance of the evidence.[86]  As was the case in *Monsanto Co.*[87], Utah case law found it necessary to apply a higher standard to prove fraud such that the burden alone could influence trial's outcome. This is an example of Utah case law deviating from the general burden rule to single out the narrow issue of creating a more exacting standard to prove fraud to ultimately

---

[81] *Monsanto Co. v. Aetna Cas. and Sur. Co.*, 1993 WL 563244, at *3 (Del. Super. Dec. 21, 1993).

[82] *Meyers*, 2015 WL 227824, at *4 (Del Super. Jan. 15, 2015) (applying Colorado's heightened burden of proof to support an award for exemplary damages); *Monsanto Co.*, 1993 WL 563244, at *3 (adopting Missouri's heightened burden of proof for lost insurance policies).

[83] *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *12 ("Each element of fraud must be proven by a preponderance of the evidence."); *Taylor v. Gasor, Inc.*, 607 P.2d 293, 294-95 (Utah 1980) ("[F]raud is a wrong of such nature that it must be shown by clear and convincing proof and will not lie in mere suspicion or innuendo.") (quoting *Lundstrom v. Radio Corp. of Am.*, 405 P.2d 339, 341 (Utah 1965)).

[84] *Monsanto, Co.*, 1993 WL 563244, at *3.

[85] *Id.*

[86] *Hansen v. Hansen*, 958 P.2d 931, 934-35 (Utah Ct. App. 1998).

[87] *Monsanto Co.*, 1993 WL 563224, at *3.

impacting a trial's outcome. Therefore, this Court will apply Utah's clear and convincing burden of proof to the fraud claims in this case.

## B. Fraudulent and Negligent Misrepresentation.

Under Utah law, a claim of fraud requires the following:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

"Misrepresentation may be made either by affirmative statement or by material omissions, where there exists a duty to speak."[88] The duty to speak does not exist where both parties have reasonable knowledge of the underlying facts.[89] In that case, the plaintiff must take "reasonable steps to inform himself, and to protect his own interests."[90] Silence on a material fact may be actionable fraud so long as the silence "relate[s] to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relationship of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances."[91]

---

[88] *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1373 (Utah 1980).
[89] *Id.*
[90] *Id.*
[91] *Elder v. Clawson*, 384 P.2d 802, 382-83 (Utah 1963).

Negligent misrepresentation requires a similar showing to fraudulent misrepresentation:

> a party injured by reasonable reliance upon a second party's careless or negligent misrepresentation of a material fact may recover damages resulting from that injury when the second party had a pecuniary interest in the transaction, was in a superior position to know the material facts, and should have reasonably foreseen that the injured party was likely to rely upon the fact.[92]

However, negligent misrepresentation does not require the same intentional mental state as fraudulent misrepresentation.[93]

Plaintiffs utilize Utah District Court case *Johnson v. Blendtec, Inc.*[94] to substantiate that Defendants' "false or incomplete representations in marketing, advertising, and labeling" adequately provide the basis for their fraud claim.[95] In their Reply brief, Defendants contend *Johnson* is not instructive because it is at the pleading stage, and the plaintiff in *Johnson* is able to point to a specific false representation.[96] Further, Defendants argue Plaintiffs fail to prove reliance on Defendants' alleged misrepresentations.[97]

The holding in *Johnson* comes at the pleading stage and relates to whether the plaintiff pled her fraud claim with particularity.[98] However, the plaintiff points the

---

[92] *Price-Orem Inc. Co. v. Rollins, Brown and Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986).
[93] *Id.* at n.2.
[94] 500 F.Supp.3d 1271 (D. Utah 2020).
[95] D.I. 194 p. 25.
[96] D.I. 213 p. 11.
[97] D.I. 164 p. 23.
[98] 500 F.Supp.3d at 1289.

Court to the exact advertisement she relied on which misrepresented the purchased blender's horsepower.[99]  *Johnson* instructs the Court that advertising may be relied upon in a misrepresentation claim.  Plaintiffs allege they relied on Defendants' representation in their "marketing materials, advertising, websites, and packaging" of the RnP that the product "was safe for infants to lie and sleep in" and "safe for unsupervised use and sleep."[100]

The majority of Plaintiffs' allegations say they relied on material omissions from Defendants' advertisements, marketing, and labels.  At this stage, Plaintiffs provide sufficient evidence to prove Defendants were on notice of issues with the RnP and had a duty to inform general consumers, including Plaintiffs, of potential safety deficiencies.  In addition, Plaintiffs were not aware, nor in a position to be aware of, any potential issues with the RnP; therefore, Plaintiffs were not expected to inform themselves or protect their own interests.

Considering this Motion in a light most favorable to the non-moving party and that there is a genuine dispute of material fact as to whether Defendants made a material omission upon which Plaintiffs relied, Defendants' Motion for Summary Judgment as to fraudulent and negligent misrepresentations is **DENIED.**

---

[99] *Id.*
[100] D.I. 1 ¶ 120, 123.

C. Fraudulent Concealment.

To establish fraudulent concealment under Utah law, "a plaintiff must prove: (1) that the nondisclosed information is material, (2) that the nondisclosed information is known to the party failing to disclose, and (3) that there is a legal duty to communicate."[101]

Defendants raise two issues with Plaintiffs' claim. First, Defendants assert Plaintiffs failed to allege a "pure nondisclosure" and, instead, only insinuates Defendants' made partial disclosures upon which a pure concealment claim cannot be made.[102] Plaintiffs respond with numerous allegations they pled concerning Defendants' silence on material facts.[103] These allegations include: "[t]he Rock 'n Play failed to conform to the AAP's safe sleep standards and recommendations," "the Rock 'n Play was not safe for infants to sleep in all night long," "[t]he Rock 'n Play's design, including its incline and angle, could cause an infant to suffocate, asphyxiate, and/or die," and "[t]he Rock n' Play had been linked to hundreds of infants' injuries and deaths . . . ."[104] The Court finds that Plaintiffs have alleged and provided sufficient evidence to create an issue for the jury as to Defendants' concealment of material facts concerning the RnP's safety.

---

[101] *Yazd v. Woodside Homes Corp.*, 143 P.3d 283, 286 (Utah 2006) (quoting *Mitchell v. Christensen*, 31 P.3d 572, 574 (Utah 2001)).
[102] D.I. 164 p. 24-25.
[103] D.I. 194 p. 27.
[104] D.I. 194, Ex. DD (citing D.I. 1 ¶121(a)-(k)).

21

Second, Defendants argue Plaintiffs fraudulent concealment is duplicative of their failure to warn claim and that these claims cannot be brought together under the same products liability suit.[105] Defendants cite to numerous Federal District Court cases to support this proposition. While each case does disallow the plaintiffs to bring both a claim of fraudulent concealment and failure to warn in their products liability case, the basis for this finding is due to factors absent from the instant case.[106]

While a review of Utah case law shows fraudulent concealment claims are not generally brought in products liability cases, this does not mean a plaintiff cannot do so. The elements of each claim and Plaintiffs' arguments under each claim are different. Plaintiffs' fraudulent concealment claim is based on Defendants' alleged concealment of material facts, while Plaintiffs' failure to warn claim is based on inadequate warnings on the RnP and its manual.

Based on the above reasons, the Court **DENIES** Defendants' motion for summary judgment as to Plaintiffs' fraudulent concealment claim.

VI.  <u>There Is No Dispute As to Plaintiffs' Allegations Incorporated in Their Negligence Claim.</u>

---

[105] D.I. 164 p. 25.

[106] *See Waterhouse v. R.J. Reynolds Tobacco Co.*, 270 F.Supp.2d 678, 684-85 (D. Md. 2003) (disallowing plaintiffs to bring both claims because the fraudulent concealment claim was preempted by the Labeling Act); *Hamner v. BMY Combat Sys.*, 869 F.Supp. 888, 892 (D. Kan. 1994) (prohibiting bringing both claims because Kansas did not recognize fraudulent concealment in products liability cases); *Spangler v. Sears, Roebuck and Co.*, 759 F.Supp. 1337 (preventing both claims from going forward because the fraudulent concealment claim was based solely on the failure to warn claim).

Defendants contend Plaintiffs' "discrete" negligence theories including (1) failure to test, (2) failure to timely recall, (3) failure to seek appropriate and adequate guidance, advice, and input, and (4) continuing to market are not independently cognizable negligence claims under Utah law. Plaintiffs reply that these allegations are "not independent caused of action at all; they are simply allegations subsumed in Plaintiffs' negligence count," to describe Defendants' conduct.

The Court finds it undisputed that Plaintiffs are not attempting to bring separate legal claims via the above-mentioned allegations. Therefore, Defendants' Motion as to this issue is **MOOT.**

VII. <u>There is a Genuine Issue of Material Fact As to the Adequacy of RnP Product Safety Warnings.</u>

"[A] manufacturer may be held strictly liable for any physical harm caused by its failure to provide adequate warnings regarding the use of its product."[107] When a manufacturer "knows or should know of a risk associated with its product" and fails to adequately warn of that risk, the product becomes "unreasonably dangerous."[108] "In any failure to warn claim, a plaintiff must show that the failure to give an adequate warning in fact caused the injury; i.e., that had warnings been

---

[107] *House v. Armour of Am., Inc. (House II)*, 929 P.2d 340, 343 (Utah 1996) (quoting *House v. Armour of Am., Inc. (House I)*, 886 P.2d 542, 547 (Utah Ct. App. 1994) (citing Restatement (Second) Of Torts §402A, cmt. J (1965))).
[108] *Id.*

provided, the injured party would have altered his use of the product or taken added precautions to avoid the injury."[109]

An adequate warning "must completely disclose all [of] the risks involved, as well as the extent of those risks."[110] An adequate warning is one "(1) [] designed to reasonably catch the user's attention; (2) [] understandable to foreseeable users; (3) fairly indicate[s] the danger from the [product's] foreseeable use; and (4) [] sufficiently conspicuous to match the magnitude of danger."[111]

Defendants maintain the RnP came with adequate warnings.[112] Defendants argue Plaintiffs' blatant ignorance of the warnings do not amount to a legal basis for failure to warn.[113]

Plaintiffs respond with Defendant's lack of warning pertaining to the foreseeable use of the RnP which was for unattended, overnight sleep.[114] An infant is swaddled when sleeping, therefore, the three-point restraint system could not be used when an infant was asleep in the product.[115] Plaintiffs argue, especially because the product was marketed for sleep, this is a foreseeable use and the warnings should anticipate it.[116]

---

[109] *House II*, 929 P2d at 346 (citing *Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832, 836-37 (Utah 1984)).
[110] *House I*, 886 P.2d at 551, *aff'd House II*, 929 P2d 340.
[111] Model Utah Jury Instructions (MUJI 2d CV 1019), *Negligence, Definition of "adequate warning."*
[112] D.I. 164 p. 26-28.
[113] *Id.* at 28.
[114] D.I. 194 p. 30-35.
[115] *Id.* at 31.
[116] *Id.* at 32-33.

Defendants cite to *Groesbeck v. Bumbo International Trust*, a Tenth Circuit case holding that the plaintiffs' ignorance of the product warnings was not a solid legal foundation for a failure to warn claim.[117] The warning in this case was to "never use on any elevated surfaces."[118] It specifically stated this caution is meant to "prevent falls."[119] The manufacturer added these warnings after reports of infants falling out of the product.[120] Despite the added warning, the plaintiffs placed their infant child in the product on an elevated surface when the incident occurred.[121]

*Groesbeck* is not instructive because the manufacturer in *Groesbeck* adapted their warning to reflect a consumer use brought to their attention. The warning relayed the specific hazards the caution prevents – falling. Despite knowing the specific danger, the parents ignored the warning completely. In the instant case, issues of adequacy still present themselves to the Court. These issues include whether the RnP warnings present Plaintiffs with specific dangers the product may cause and whether nonuse of the restraint system and use of a blanket in the product are foreseeable uses the warning should have anticipated.

---

[117] 718 F.App'x 604, 619 (10th Cir. 2017).
[118] *Id.* at 608.
[119] *Id.*
[120] *Id.* at 607.
[121] *Id.* at 609.

Both parties utilize expert witnesses to argue adequacy of the warnings.[122] The Court believes the experts should have the opportunity to testify, and parties to cross-examine, before a jury and allow them to decide expert credibility.

The Court finds that there is a genuine issue of material fact as to whether Fisher-Price provided adequate warnings for use of the RnP and, if so, whether Plaintiffs would have opted to not use the product had the warnings been sufficient. These issues must be submitted to a jury. Therefore, the Court **DENIES** the Defendant's motion for summary judgment as to failure to warn.

VIII. <u>The Issue of Conscious Pain and Suffering Should Be Submitted to a Jury.</u>

As discussed in the Court's Order to Defendants' *Daubert* Motions and Motions in Limine concerning A.M.B.'s conscious pain and suffering and the relating expert testimony, the Court finds that Plaintiffs produce sufficient evidence and reliable expert testimony to submit the question of whether A.M.B. suffered conscious pain and suffering to a jury. Therefore, the Court **DENIES** Defendants' Motion as to pain and suffering damages.

---

[122] *See* D.I. 164 p. 28, D.I. 194 p. 31-32.

## CONCLUSION

Based on the above reasons, Defendants' Motion to Dismiss is **DENIED IN PART AND GRANTED IN PART.**

**IT IS SO ORDERED.**

                                              */s/ Francis J. Jones, Jr.*
                                              Francis J. Jones, Jr., Judge

*cc:    File&ServeXpress*